711 A.2d 917

ANN BAKER AND BARBARA HAUSLEITER, PLAINTIFFS–RESPONDENTS/ CROSS–APPELLANTS, v. THE NATIONAL STATE BANK, NEW JERSEY NATIONAL BANK (A/K/A CORESTATES) ITS SUCCESSOR–IN–INTEREST, LEO AHERN, REG. MGR. OF NSB AND INDIVIDUALLY, ARTHUR CAMPBELL, FORMERLY EXEC. V.P. OF NSB AND INDIVIDUALLY, DEFENDANTS–APPELLANTS/ CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 27, 1998—Decided June 2, 1998.

Before Judges NEWMAN and COLLESTER.

*Cynthia M. Jacob,* argued the cause for appellants/ cross-respondents (*Collier, Jacob & Mills,* attorneys; *Ms. Jacob,* of counsel and on the brief; *David H. Ganz* and *Sandra N. Fears,* on the brief).

*Patricia Breuninger,* argued the cause for respondents/ cross-appellants (*Breuninger & Fellman,* attorneys; *Ms. Breuninger,* of counsel and on the brief; *Laura M. LeWinn* and *Fredric J. Gross,* on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

Plaintiffs Ann Baker and Barbara Hausleiter, branch managers with defendant, The National State Bank (the Bank), were terminated in a reduction in force in 1991. Defendants Leo Ahern, the Bank's regional manager, and Arthur Campbell, its vice president in charge of branch operations and community banking, were responsible for choosing plaintiffs for dismissal. Defendant New Jersey National Bank, a/k/a Corestates New Jersey National Bank, is the Bank's successor in interest.

Plaintiffs proved during trial that their dismissals were the result of age discrimination (Baker was fifty-four and Hausleiter was forty-nine), and for Baker, also gender discrimination. A jury awarded Baker and Hausleiter compensatory damages which, with interest, totalled $155,133.00 and $128,235.00, respectively, and puni-

tive damages of $4,000,000.00 which plaintiffs agreed to share evenly. Plaintiffs were awarded attorneys' fees and costs which totalled $338,227.45.

Defendants object to various sections of the jury charge, primarily arguing error in the explanation of preponderance of the evidence, and in failing to charge that plaintiffs were required to prove a *prima facie* case. Defendants further contend that the award of punitive damages was improper, because (1) there was no malicious or willful conduct; (2) the award was inconsistent because it was against the Bank only, and not the individuals; (3) the successor bank should not be liable for punitive damages; and (4) plaintiffs failed to prove the financial condition of the Bank at the time of the wrongdoing. Finally, defendants argue that evidence of the performance of the employees who replaced plaintiffs should not have been admitted, the verdict was against the weight of the evidence, and the award of counsel fees was excessive.

Plaintiffs cross appeal, contending that the hourly rate used for the counsel fee award should have been the current rate, rather than the rate at the time the services were performed. We are satisfied that the issues raised on the appeal and cross-appeal should be rejected and, therefore, affirm.

These are the relevant facts. Ann Baker began working for the Bank in 1973 as a part-time teller. In 1978, Baker became a full-time teller and was promoted to head teller within a year. By 1981, Baker was an assistant branch manager. After completing a management training program, Baker successfully assisted with a difficult merger.

Baker next served as branch manager at Kenilworth for a few months and in August 1985 was transferred to Rahway, which was experiencing serious difficulties in personnel and audits. An audit in November 1985 showed substantial improvement.

Arthur Campbell, regional administrator at that time, occasionally visited Baker's branch and commented that things were going

well. He also sent her several memoranda thanking her for her exceptional work.

Terry Busichio became Baker's regional manager while Baker was in Rahway. In June 1988, Busichio wrote to Campbell recommending Baker for a promotion and a raise because her lending authority had increased and she was successfully managing a portfolio of $3.7 million. In March 1989, Busichio evaluated Baker's overall performance as consistently exceeding expectations, noting her branch's success in deposit growth, loan growth, control of expenses, and outstanding audit rating which was the highest possible. Busichio recommended Baker as "capable of taking on more complex assignments."

In early 1989, Busichio transferred Baker to Perth Amboy, a larger branch than Rahway, which had been experiencing many problems. Indeed, management "had lost control of the branch." Baker was upset, because, after working hard to "turn [Rahway] around," she was finally beginning to enjoy it, and could spend time with customers instead of constantly "putting out fires." In addition, Baker was not looking forward to the overtime required for a problem branch. When Baker protested, however, Busichio insisted that only Baker "could handle the responsibility." On Busichio's recommendation, to Campbell, Baker was promoted to assistant vice president when she was transferred to Perth Amboy.

Perth Amboy was Baker's "worst nightmare come true." Every area of the bank was a problem. Morale was low, staff members did not get along, loans were unproductive and not properly documented, and policies and procedures were not followed. Baker worked late many nights, sometimes until 10:00 p.m.

Michael Couch, who supervised branch managers' loans, worked out of the Perth Amboy office and was familiar with its problems. Couch "felt for" Baker when she became manager there because she was "walking into a hornet's nest." Baker's regional manager in Perth Amboy was Joseph Gervasio, who constantly compliment-

ed Baker on her efforts to turn the branch around. Gervasio reported to Campbell, who was aware of Baker's success.

Meanwhile, Bill McDowell, a young man in his late twenties or early thirties who managed the Perth Amboy branch before Baker, was assigned to the Pennington branch, which was new, in a nice location, and easier to manage. Baker noted that the Bank had terminated managers for problems less serious than the ones McDowell had created at Perth Amboy. She felt it unfair that she had to "clean up his mess," while he was not held accountable. According to Campbell, however, the Bank terminated the regional manager who was responsible for Perth Amboy's "fairly considerable loan problems," and McDowell's lending authority was suspended.

When Baker began at Perth Amboy on March 28, 1989, she requested an audit to ascertain exactly what needed to be done. The audit, completed on May 5, 1989, rated Perth Amboy as unsatisfactory, which was not surprising. On November 14, 1989, another audit rated Perth Amboy as below average, an improvement over the first audit.

In February 1990, Gervasio recommended and Campbell approved a promotion and raise for Baker because of her successful performance. In Baker's performance appraisal of March 1990, Gervasio rated her overall performance as meeting all expectations. He commented that "a less qualified person could not have survived the operational and human resource issues that confronted Perth Amboy," praised Baker's leadership, and expressed confidence in her "ability to put Perth Amboy back in its rightful place."

An audit of August 7, 1990 again rated the Perth Amboy branch as below average. Baker felt that this was fair, as there were still many things that needed to be done. Nancy Lystash, an audit examiner with the Bank, recalled that when Baker was at Rahway, the audits there were favorable and "very smooth." She explained that even before Baker came to Perth Amboy, there were serious violations of operating procedures, including a lack of separation of

duties, unsecured bearer instruments, and excessive teller differences. "[S]erious financial loss to the bank" was a concern because "the controls [were] breaking down."

Prior to Baker's arrival, the Perth Amboy branch was last audited in 1988 and was considered "satisfactory." Lystash explained, however, that this audit did not reflect the subsequent problems with teller differences prior to Baker's arrival, which required unofficial audits without ratings. According to Lystash, the unsatisfactory audit of May 3, 1989, was not attributable to Baker because Baker had not been at Perth Amboy for very long. Lystash noted improvement in Perth Amboy between the November 1989 and August 1990 audits performed while Baker was branch manager.

Gervasio again assessed Baker's performance in March 1991, and rated her overall performance as meeting most expectations. He commented:

Perth Amboy is finally turning the corner toward a deposit growth and overall profitability. This in large part is due to Ann's ability to manage both the financial and human resource issues to accomplish the [branch's] expectation. Ann's management expertise are [sic] a good match for what is needed in Perth Amboy.... [I]n the areas [in which] the branch needs improvement, I am confident Ann has built the foundation to succeed in 1991.

There were two areas in which Baker did not meet expectations: increasing ATM use and the number of deposits. Baker explained that the ATM was in a remote location where vagrants would congregate, leave beer bottles, and urinate on the machine. Additionally, rather than increasing deposits, customers were closing their accounts because of concern about the Bank's financial condition. Gervasio acknowledged that a branch manager who needed to attend to numerous operational problems would not be able to spend as much time on increasing deposits and obtaining new business.

According to Baker, Gervasio understood these problems and assured her that "meets most is not a bad review." At managers' meetings, Campbell repeatedly explained that an evaluation of "meets most" was not a bad review and should not be a cause for

concern. Gervasio corroborated that "meets most" was acceptable, and, generally, a raise accompanied it. He was satisfied with Baker's performance, and could not recall that a branch manager was ever terminated for having a performance review of "meets most." In fact, in July 1991, Campbell visited the Perth Amboy branch and told Baker that he was pleased with the job that she was doing. Barbara Timoni, an assistant vice president of the Bank in human resources, admitted that "meets most" was "not necessarily a poor rating."

In August 1991, Leo Ahern replaced Gervasio as Baker's regional supervisor. At a meeting with the regional managers, Ahern introduced himself and said, "I see I have seasoned mature managers in this region." According to Baker, Ahern continued with a smirk, "I didn't have that privilege in my last region, but of course that's because I terminated them all." Ahern denied making these statements.

On October 29, 1991, Baker was abruptly removed from a meeting and ordered to report to the Bank's headquarters in Linden, where Busichio advised her and several others that, because the Bank had been having problems, it had been ordered to cut its costs and downsize, and their positions had been eliminated. Busichio stressed that the terminations had "nothing to do with job performance." A form letter dated October 29, 1991 from the Bank's senior vice president confirmed that Baker's "position has been eliminated."

Jay Castillo, a younger man who had been employed by the Bank for only two months, replaced Baker in Perth Amboy. Castillo had been manager of the Hillside branch, which was closing. Baker also learned that McDowell, Perth Amboy's previous manager, was still working at Pennington.

Baker filed a complaint in the Division on Civil Rights, and in July 1992, at a fact-finding conference, Busichio asserted that Baker was selected for termination because of her "meets most" performance review in March 1991. Busichio explained that she

and Ahern had decided that Castillo would be one of their "go forward players" in Perth Amboy because he spoke Spanish.

Baker insisted that she had been consistently told that "meets most" was not a bad review, and, had she any reason to believe otherwise, she would have objected and asked that it be changed. Moreover, Baker was never told that an ability to speak Spanish was necessary for the position. During trial, Gervasio corroborated that the Perth Amboy branch manager did not need to speak Spanish.

Later, after Baker withdrew her complaint in the Division on Civil Rights and filed her current complaint, defendants, in answers to interrogatories, accused her of having bad loans, audits and overdrafts. According to Baker, none of this was true. Baker noted that Gervasio had commended her for keeping her overdrafts minimal and following up on them. Gervasio corroborated that Baker did not have a problem with unsatisfactory audits or overdrafts. Couch agreed that the portfolio of loans that Baker had made herself was above average, and that she had inherited many delinquent loans at Perth Amboy.

Baker began searching for a new job immediately but was not successful; her family was forced to borrow funds to maintain their household. Baker became depressed and had difficulty sleeping. She had an especially difficult time telling her ninety-year-old father that she had lost her job.

Finally, in March 1993, Baker was able to obtain a position as a manager at Midlantic Bank (Midlantic). She had a difficult time learning new procedures and policies and felt inadequate and frustrated. At the time of trial, Baker was still employed at Midlantic but was earning less than when she worked at the Bank. Assuming a 5% annual increase if she had remained at the Bank, which was below her 8.8% average annual increment, and deducting her unemployment compensation, Baker calculated that her lost earnings totalled $63,704 through June 30, 1996.

Hausleiter began working at the Bank in 1970. After six years as a teller, she became a vault attendant, was later promoted to note and collection person and then became a customer service representative. In 1981, she was promoted to assistant branch manager and later completed the management training program. In January 1986, she was appointed manager of the Fords branch.

Hausleiter's performance reviews were always laudatory. She worked "long hard hours" and took pride in her work. In 1986 and 1987, her managers rated her overall performance as consistently exceeding expectations, the highest rating, noting that her branch had received the highest audit rating. Campbell signed some of Hausleiter's performance reviews, told her she was doing a good job, and encouraged and supported her. A memo from Campbell to Hausleiter in 1988 congratulated her on her second successive outstanding audit. Hausleiter received other memos from Campbell which contained similar content.

In 1990, Gervasio became Hausleiter's regional manager and helped her set up a personal finance center, which was basically personal service for customers with large balances. Gervasio recalled that he chose Fords for this service because of its large deposits, the ratio of larger average-balance customers, and good management. Hausleiter explained that "[t]he customers just loved it," and her branch attracted 150 new accounts with a $5 million increase in the branch's balance in that area. Gervasio was satisfied with the Fords personal finance center.

Gervasio rated Hausleiter's overall performance as meeting all expectations in 1990 and complimented her on achieving a "good year in gathering deposits and increasing [the Bank's] loan portfolio." Gervasio noted that Hausleiter had "the added responsibility of running the branch" in the fourth quarter, since she had no assistant during that time. In 1991, Gervasio again rated Hausleiter's overall performance as meeting all expectations.

Hausleiter recalled that Gervasio consistently praised and commended her work. She explained that in 1990 and 1991 her goals became more difficult "in view of the condition of the bank." She

observed that no one could achieve every single goal. She understood that "meets all" was an excellent review, particularly in light of Campbell's statement to the managers in 1991 that "meets most" was "acceptable" and "fine."

In August 1991, Ahern became Hausleiter's regional manager. Hausleiter recalled the introductory meeting, during which Ahern said that he had "the luxury of mature, seasoned managers" in this region, which he did not have before because he had terminated them. Hausleiter remembered that Ahern was grinning and rubbing his hands together when he said this, "like he was just so pleased . . . with himself."

On October 29, 1991, Hausleiter, like Baker, was summoned to the Bank's headquarters in Linden where she was terminated by Busichio. Hausleiter corroborated that Busichio emphasized that the terminations had nothing to do with performance, but rather, Busichio announced that "the [B]ank is restructuring and your jobs have been eliminated." Hausleiter received the same form termination letter that Baker received.

Hausleiter was shocked, humiliated and embarrassed when she was terminated. She explained that she was active in the community and knew all of her customers and their families. She was concerned that her customers might think that she had stolen funds.

Hausleiter, who was forty-eight years old when she was terminated, was replaced by Ann Margaret Shannon, who was twenty-one years younger and had been with the Bank about a year. The Bank assigned an assistant manager to Shannon, a position which was vacant when Hausleiter was manager.

Hausleiter began looking for work, but was unable to find another position. She was depressed, upset, anxious, nervous and worried about her finances. She and her husband had to remortgage their house. She filed a complaint with the Division on Civil Rights.

Hausleiter recalled that, during a fact-finding conference, Barbara Timoni of human resources stated that Hausleiter was terminated because of her performance with her loan portfolio, and her lack of support for the personal finance center. Hausleiter had never heard either of these criticisms before and was stunned. Hausleiter had no problems with her $3.5 million commercial loan portfolio; none of her loans were ever over thirty days late. Couch corroborated that Hausleiter's loan portfolio was above average, compared to other branch managers, and she had trouble only with the loans that she had inherited.

Hausleiter also said that it was untrue that she did not support the personal finance center. For the first time at the fact-finding conference, she saw Gervasio's notes in her personnel file, in which he stated that Hausleiter would be "able to get the staff . . . going and accept the concept of the personal finance center." The notes did not criticize Hausleiter, or state that she did not support the personal finance center. During trial, Gervasio testified that Hausleiter was not hostile to the personal finance center, but that her staff was, and that he and Hausleiter worked with the staff to solve the problems.

Gervasio denied that he placed his notes in Hausleiter's personnel file, and agreed that they did not belong there. He explained that a document intended for a personnel file, unlike his notes, would be typed, documented, and dated. He did not feel that Hausleiter needed to be disciplined because of her operation of the personal finance center. Timoni, however, asserted that Gervasio's notes recorded a counseling session that was part of the disciplinary procedure. Additionally, Ahern was certain that these notes, although they did not contain Hausleiter's last name or the year that they were prepared, documented counseling under the Bank's progressive discipline policy, since they were "marked counseling, action, follow up within 60 days."

Hausleiter found new employment with the Somerset Trust Company as of November 30, 1992, earning $32,000; her salary with the Bank had been over $39,000. She was earning $39,300 at

the time of the trial. Assuming annual increments of five percent if she had remained employed by the Bank, which was less than her seven percent average increase, and deducting her unemployment compensation, Hausleiter calculated that her lost earnings totalled $57,384 through June 30, 1996.

During trial, Busichio recalled that she recommended to Campbell that Castillo and Shannon be retained, although their branches were scheduled to be closed, and helped Campbell select them to replace plaintiffs. Busichio explained that Shannon and Castillo were experienced and qualified, and that their performance with the Bank had been excellent. Campbell and Ahern, who had supervised Shannon, both praised her work as manager of the South Orange branch.

Busichio appraised Castillo's performance in March 1993, after he became manager of the Perth Amboy branch. Despite failing to meet expectations in six out of seven categories, his overall rating was "meets most," because of other significant performance factors. Nevertheless, Busichio recommended no salary increment for Castillo that year. She noted his inability to address his shortcomings and accept constructive criticism. Couch stated that Castillo was granted lending authority although he was neither qualified nor trained for it, and he sometimes used bad judgment. Castillo later resigned.

Busichio became Shannon's supervisor in August 1991. After she became manager of the Fords branch, Shannon received several warnings and was ultimately terminated for poor performance.

Campbell, responsible for some fifty branches, reported that in 1989, the Office of the Controller of Currency (OCC), a federal agency charged with regulating and examining commercial banks, found serious problems with the Bank's commercial loans. In fact, in 1989, trading on the Bank's stock ceased due to significant losses. The losses continued and OCC exams in 1990 and 1991 revealed recurrent problems with severely deficient real estate and commercial loans. The Bank's president and officer in charge

of loan review argued with the examiners that they were too harsh, but the board of directors terminated them under the direction of the OCC. Campbell explained that the OCC had the authority to close a bank or replace its management.

According to Campbell, the Bank reported operating losses of over $60 million in the first quarter of 1991. A plan to comply with OCC directives included reorganization, consolidation, closing branches and a reduction in force (RIF). Closing branches decreased the Bank's assets, enabling it to comply with the OCC's capital ratios. Campbell noted that "the profitability of the branch system and the retail banking area probably saved the [B]ank."

In September 1991, Campbell told Ahern that about ten percent of the workforce had to be eliminated. Ahern was frustrated since this was his first significant act as regional manager. Campbell advised him "to try to keep the strongest resources and eliminate those who were weaker," as determined by their most recent performance appraisals of March 1991 and subsequent performance.

Ahern testified in deposition, excerpts of which were read into evidence, that Campbell responded to Ahern's expression of frustration by saying, "Baker and Hausleiter have to go." At trial, both Ahern and Campbell denied that Campbell said this. However, Ahern later admitted that, after discussing the plaintiffs, Campbell said that they "have to go." Campbell recalled saying that Gervasio thought that plaintiffs "were not his strongest resources," and Ahern should "take a good look" at them.

Campbell reported that Baker was not considered a strong resource because "the Perth Amboy branch was not performing at expectations." However, he admitted on cross-examination that Baker was assigned to Perth Amboy because she "was one of the more experienced and one of the better managers." He conceded that bringing the audit up from unsatisfactory to below average in five or six months was "a measured improvement."

Ahern stated that he considered performance reviews in making his decision. He noted that of the ten branch managers who reported to him, three had achieved a rating of "consistently exceeds expectations" in March 1991 and six had achieved "meets all expectations." Baker was the only person with "meets most expectations."

Ahern told Campbell that he had a question about Hausleiter. Campbell responded that there were "[d]ocumented performance issues" with Hausleiter's prior manager, Gervasio. During trial, Campbell recalled that he and Gervasio had discussed problems at the Fords branch, and Campbell asked Gervasio to document them, including "Hausleiter's performance as the branch manager." Campbell and Ahern concurred that Gervasio's notes were not in Hausleiter's file initially, and had to be obtained from Gervasio. Campbell and Ahern recalled meeting with Gervasio and discussing the subject of the notes, i.e., Hausleiter's "difficulty with convincing the employees that they should do what it was they needed to do." Later, however, Ahern testified that Gervasio's involvement was limited to interpreting his handwriting. Gervasio denied that he participated in the decision to terminate either plaintiff.

In any event, the Bank terminated 147 employees, including plaintiffs, on October 29, 1991. Campbell expected that some of the discharged employees would be replaced by reassignments or new hires, and reported "some shuffling" among tellers and "lower level people." However, he was unaware of anyone on the RIF list, except the plaintiffs, who were actually replaced. Campbell and Ahern denied that they considered plaintiffs' age or gender when making their decisions.

We now address the multiple issues raised on the appeal and cross-appeal.

I.

[Those portions of Section I which address the following arguments have been omitted from this opinion for publication pur-

poses: the jury charges regarding (1) burden of proof, (2) pretext, (3) reduction in force "based on performance," (4) whether defendants acted wrongfully, and (5) conduct warranting punitive damages, and the issue of front pay. The published portions of Section I have been renumbered accordingly.]

## A. *Prima Facie Case*

Defendants contend that the trial judge erred in charging the jury that plaintiffs had proved their initial case, and in refusing to charge in accordance with their proposed jury instruction that plaintiffs were required to prove each element of their *prima facie* case.

At the charge conference, defendants argued that whether plaintiffs' performance was satisfactory was part of the *prima facie* case that should be submitted to the jury. Plaintiffs countered that, because they had been working as branch managers for ten years, they were objectively qualified for their positions. They noted that if they had not established a *prima facie* case, defendants would have prevailed on summary judgment.

The judge charged that plaintiffs had proved their initial case, reasoning: "I will not require the jury to do something that does not need to be done. They are only to decide issues that exist." He instructed the jury:

> To succeed on their claims a plaintiff must first establish by a preponderance of the evidence an initial case of discrimination on account of her age or sex. I charge you that the plaintiffs have met their burden of proving the initial case here. Ann Baker was discharged and replaced by a younger employee who was also male. Barbara Hausleiter was discharged and replaced by a younger employee.

Defendants assert that the jury should have been required to decide whether plaintiffs were qualified, compared to the other branch managers, to retain their jobs in the RIF, an issue "hotly disputed throughout the trial." Notably, the jury was required to decide this issue. The charge continued:

> You the jury must determine whether each plaintiff also has satisfied her ultimate burden of proving intentional discrimination by a defendant. Defendants maintain that they did not discharge or replace plaintiffs based on age or gender, but discharged the plaintiffs because of a general reduction in force based on

performance. I charge you that if true a general reduction in force based on performance is a legitimate non-discriminatory basis for a defendant's action.

Thus, the jury was instructed to decide this essential fact issue of plaintiffs' performance. There was no need for the jury to consider performance specifically in the context of the *prima facie* case. Cf. *Greenberg v. Camden County Vocational and Technical Schools*, 310 *N.J.Super.* 189, 202, 708 *A.*2d 460 (App.Div.1998) (finding performance and qualifications to be issue once *prima facie* case had been established, not as part of *prima facie* case).

The *prima facie* case of discrimination in employment, originally set forth in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973), and adopted in New Jersey, *Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 551, 569 *A.*2d 793 (1990), requires a plaintiff to show that she was (1) a member of a protected class; (2) performing her job in a satisfactory manner; (3) discharged; and that (4) someone else performed her job after she left. Once the plaintiff establishes a *prima facie* case, the burden of production but not proof shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. The plaintiff must then show that the employer's proffered reason was not the true reason for its decision, but a pretext for discrimination. 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677. The issue of plaintiffs' job performance for the purpose of establishing a *prima facie* case is distinct from the issue of their job performance for the purpose of refuting defendants' legitimate, non-discriminatory reason for their terminations, *i.e.*, their performance was not as good as that of the branch managers who were retained.

In *Sempier v. Johnson & Higgins*, 45 *F.*3d 724, 726 (3d Cir.), *cert. denied*, 515 *U.S.* 1159, 115 *S.Ct.* 2611, 132 *L.Ed.*2d 854 (1995), plaintiff was chief financial officer and then chief administrative officer of defendant, an insurance brokerage firm. His responsibilities were decreased and he was terminated when he refused to retire. Although defendant alleged that it terminated plaintiff because of unsatisfactory job performance, the court determined that, objectively, plaintiff had established a *prima facie* case. *Id.*

at 729–30. Noting that the burden of establishing a *prima facie* case of disparate treatment is not intended to be onerous according to *Texas Dep't of Community Affairs v. Burdine*, 450 *U.S.* 248, 253, 101 *S.Ct.* 1089, 1093–94, 67 *L.Ed.*2d 207, 215 (1981), the court explained that an objective standard should be used. 45 *F.*3d at 729. Whether an employee has a subjective quality, such as leadership or management ability, should be considered when determining whether the employer's non-discriminatory reason for the termination was a pretext. *Ibid.* The court commented that plaintiff "had the objective experience and education necessary to qualify as a viable candidate for the positions he held. He had held executive level positions at [defendant company] for over twenty years." *Ibid.*

Similarly here, plaintiffs were objectively qualified for their positions as branch managers, which they had held for some ten years. Campbell admitted that they were "good managers" whom he promoted and congratulated. Whether their performance had declined, as evidenced by Baker's last evaluation and the notes in Hausleiter's file, as defendants contended, was properly considered in connection with a determination of whether defendants' reasons for plaintiffs' terminations were pretextual.

Defendants also argue that only plaintiffs' recent job performance "*at the time of the RIF vis-a-vis* similarly situated employees" was relevant, not how they performed in the past. However, under *Sempier, supra,* their years of holding the positions of branch manager constitute a factor in establishing the second prong of the *prima facie* case. Their performance up to the time of the RIF, as compared to that of the other branch managers, determines whether defendants' reasons for their termination were pretextual, an issue that the jury decided.

Defendants assert that both the elements of the *prima facie* case and the burden-shifting framework should have been submitted to the jury. They cite *Jackson v. Georgia–Pacific Corp.,* 296 *N.J.Super.* 1, 16–17, 685 *A.*2d 1329 (App.Div.1996), *certif. denied,* 149 *N.J.* 141, 693 *A.*2d 110 (1997), in which the jury was instructed

to decide whether plaintiff had established a *prima facie* case, and found that plaintiff had failed to prove that his job performance met defendant-employer's reasonable expectations.

However, the *Jackson* court commented that it "read the entire transcript of the trial" and was "not at all surprised by the verdict," since the evidence in support of this conclusion was, "to put it mildly, overwhelming." *Id.* at 8, 685 *A.*2d 1329. Here, in contrast, plaintiffs submitted strong evidence that their job performances were superior, and that defendants' proffered reasons for their discharges were untrue. *Jackson* does not require that the jury must always determine whether a plaintiff has established a *prima facie* case.

In *Loeb v. Textron, Inc.*, 600 *F.*2d 1003 (1st Cir.1979), an age discrimination case cited by defendants, the court concluded that a jury must find that plaintiff established the elements of a *prima facie* case where plaintiff's claim "is provable primarily in classic *McDonnell Douglas* terms. If the principal ingredients of plaintiff's case are inferences that are to be derived from the underpinnings of the *McDonnell Douglas*-type *prima facie* case, the jury should be asked to make these findings." *Id.* at 1018. On the other hand, if there is other direct or circumstantial evidence of discriminatory motive, the court acknowledged that charging the elements of a *prima facie* case might be "superfluous" or might "divert the jury from the real issues." *Ibid.* The court warned:

*McDonnell Douglas* was not written as a prospective jury charge; to read its technical aspects to a jury ... will add little to the juror's understanding of the case and, even worse, may lead jurors to abandon their own judgment and to seize upon poorly understood legalisms to decide the ultimate question of discrimination.

[*Id.* at 1016.]

Since *Loeb,* the United States Supreme Court has clarified the meaning and use of the *prima facie* employment discrimination case. In *Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 255 n. 10, 101 *S.Ct.* at 1095 n. 10, 67 *L. Ed.*2d at 216 n. 10, the Court explained that once the defendant produces evidence of its legitimate, non-discriminatory reason for its adverse employment decision, the presumption of discrimination is rebutted and

"drops from the case." Plaintiff must then show that the proffered reason was a pretext, and "[t]his burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217. The Court commented, "Usually, assessing the burden of production helps the judge determine whether the litigants have created an issue of fact to be decided by the jury." *Id.* at 254 n. 8, 101 *S.Ct.* at 1095 n. 8, 67 *L.Ed.*2d at 216 n. 8.

In *United States Postal Serv. Bd. of Governors v. Aikens,* 460 *U.S.* 711, 713, 103 *S.Ct.* 1478, 1481, 75 *L.Ed.*2d 403, 409 (1983), a race discrimination case, the employer argued that, to establish a *prima facie* case, the employee had to show more than that he was black and qualified for a promotion for which a non-minority applicant was selected. The Court commented:

> Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination vel non.
>
> [*Id.* at 713–14, 103 *S.Ct.* at 1481, 75 *L.Ed.*2d at 409.]

Citing *Burdine, supra,* the Court explained: "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Id.* at 715, 103 *S.Ct.* at 1482, 75 *L.Ed.*2d at 410.

More recently, in *St. Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 113 *S.Ct.* 2742, 125 *L. Ed.*2d 407 (1993), on which defendants rely, the District Court, after a bench trial, disbelieved the employer's reasons for discharging plaintiff, but nevertheless found that plaintiff had failed to prove that his race was the determining factor. *Id.* at 508, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417. The Court of Appeals reversed, reasoning that plaintiff was entitled to a judgment as a matter of law once he proved that the proffered reasons were a pretext. *Id.* at 508–09, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417. The Supreme Court disagreed, holding that once "the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and

burdens—is no longer relevant." *Id.* at 510, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 418. The presumption created by the *prima facie* case, "having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture," and the factfinder "proceeds to decide the ultimate question," whether the employer discriminated against the plaintiff because of his or her membership in the protected class. *Id.* at 510–11, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 418.

This is what occurred here. Once defendants came forward with their legitimate, non-discriminatory reasons for terminating plaintiffs, the presumption and burden-shifting of the *prima facie* case became irrelevant. The jury was properly required to make only the ultimate finding of fact, whether defendants discriminated against plaintiffs because of their age and/or sex.

Following *Burdine, Aikens,* and *Hicks,* many courts which have considered the issue have determined that, in an employment discrimination case, it is either unnecessary or incorrect to charge the jury on the elements and burden-shifting of the *prima facie* case. *See Shattuck v. Kinetic Concepts, Inc.,* 49 *F.*3d 1106, 1110 (5th Cir.1995) (rejecting the employer's contention that the jury charge was erroneous because it omitted an element of the *prima facie* case, concluding that "the pertinent inquiry is whether the plaintiff has proven discrimination, not whether he has made a *prima facie* case."); *Gehring v. Case Corp.,* 43 *F.*3d 340, 343 (7th Cir.1994), *cert. denied,* 515 *U.S.* 1159, 115 *S.Ct.* 2612, 132 *L.Ed.*2d 855 (1995) ("burden-shifting model applies to pretrial proceedings, not to the jury's evaluation of evidence at trial"); *Williams v. Valentec Kisco, Inc.,* 964 *F.*2d 723, 730–31 (8th Cir.), *cert. denied,* 506 *U.S.* 1014, 113 *S.Ct.* 635, 121 *L.Ed.*2d 566 (1992) ("Once a full record has been developed, ... the factfinder should proceed to the specific question of whether the action of the employer was discriminatory"); *Grebin v. Sioux Falls Indep. School Dist. No. 49–5,* 779 *F.*2d 18, 20 (8th Cir.1985) ("*McDonnell Douglas* was not a jury case and its ritual is not well suited as a detailed instruction to the jury"). *But see Kehoe v. Anheuser–Busch, Inc.,* 96 *F.*3d

1095, 1104 (8th Cir.1996) (court in *dicta* instructed district courts to charge the elements of *prima facie* case; *Kehoe,* however, involved the failure to transfer the employee to an open position with the employer and not a discharge).

■ In any event, no crucial portion of the charge was omitted here. As in *Aikens, supra,* plaintiffs' case was fully tried on the merits, and the ultimate question was whether defendants discriminated against plaintiffs, not whether plaintiffs proved a *prima facie* case. *See* 460 *U.S.* at 713–14, 103 *S.Ct.* at 1481, 75 *L. Ed.*2d at 409. There was no error in the failure to charge the elements of a *prima facie* case.

[The remainder of Subsection A has been omitted for publication purposes.]

B. *Modify Prima Facie Case in RIF situations*

Defendants also assert that in a discharge resulting from a RIF, the *prima facie* case should be modified to require the plaintiff to produce additional evidence of discrimination, in accordance with *Holley v. Sanyo Mfg., Inc.,* 771 *F.*2d 1161, 1165 (8th Cir.1985). There, the court reasoned that without an additional showing, "every plaintiff in a protected age group [would] be allowed a trial simply because he was discharged during a reduction-in-force." *Id.* at 1166.

We, however, find the reasoning of *Marzano v. Computer Science Corp., Inc.,* 91 *F.*3d 497 (3d Cir.1996) compelling. There, the court noted that the Third Circuit Court of Appeals has relaxed the fourth prong of the *prima facie* case in the RIF situation, so that a plaintiff whose position was eliminated need not show that he or she was replaced, but must show that the employer retained someone outside the protected class. *Id.* at 503. The court declined to impose the requirement of additional evidence because "[i]t would topple the complex evidentiary edifice constructed by the Supreme Court, and impose on plaintiff the very burden that *McDonnell Douglas* sought to avoid—that of uncovering a smoking gun," or producing direct evidence of dis-

crimination. 91 *F*.3d at 510. We agree with the court's analysis that such a decision will not "open the judicial floodgates." As that court stated:

> Rather, the effect of our rule is that in every case where an employee in a protected class is laid off as part of a reduction in force while unprotected colleagues are retained, the employer may be compelled to state the nondiscriminatory reason—assuming there is one—for the action.
>
> [*Ibid.*]

Contrary to defendants' contention that "no New Jersey decision has addressed the applicable *prima facie* case in the context of a reduction in force," we utilized the *prima facie* analysis in a RIF situation involving age discrimination in *Geldreich v. American Cyanamid Co.*, 299 *N.J.Super.* 478, 691 *A*.2d 423 (App.Div. 1997). Reversing a summary judgment in favor of the employer, we set forth the *prima facie* case enunciated in *Erickson, supra,* 117 *N.J.* at 551, 569 *A*.2d 793. The fourth prong was "that [the employer] sought someone to perform the same work after he left." 299 *N.J.Super.* at 489, 691 *A*.2d 423 (quoting *Erickson, supra* ). Because the plaintiff produced evidence that his job functions survived and were allocated to younger workers, and that younger workers were retained when he was discharged, we concluded that he had established his *prima facie* case. *Id.* at 490, 691 *A*.2d 423. Similarly here, plaintiffs proved that their particular job functions survived and were allocated to younger workers, Shannon and Castillo, and in Baker's case, the younger replacement was also a man.

[The remainder of Subsection B has been omitted for publication purposes.]

## II.

[Section II, which addresses the trial judge's failure to charge the jury regarding the involvement of upper management, has been omitted for publication purposes.]

## III.

[Those portions of Section III which address the following arguments have been omitted from this opinion for publication purposes: (1) whether the Bank's conduct supported an award of punitive damages, and (2) whether the punitive damages award against the Bank but not its individual employees was proper.]

Defendants contend for the first time on appeal that New Jersey National Bank (Corestates) should not be liable for the punitive damages resulting from the wrongful acts of its predecessor in interest, the Bank. Contrary to defendants' arguments, the liability of the successor was not an issue during pretrial motions. In fact, throughout this litigation, defendants consistently represented that the Bank's successor would pay any judgment against them.

In any event, defendants are incorrect that a successor corporation is not liable for the punitive damages of its predecessor. Defendants stress that plaintiffs would be "made whole" without punitive damages, and that punitive liability "will serve only to deter corporate transactions involving failing businesses" and thus "flies directly in the face of the public policy of insuring that unprofitable business be made profitable wherever possible." However, defendants ignore the countervailing public policy of the LAD:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of ... age [or] sex .. are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundations of a free democratic State....
>
> ...
>
> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm.... Such harms have, under the common law, given rise to legal remedies, including ... punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

[*N.J.S.A.* 10:5-3.]

*N.J.S.A.* 14A:10–6(e) protects plaintiffs' punitive damage award and is controlling here. It provides that, when the merger or consolidation of two corporations becomes effective,

[t]he surviving or new corporation shall be liable for all the obligations and liabilities of each of the corporations so merged or consolidated; and any claim existing or action or proceeding pending by or against any of such corporations may be enforced as if such merger or consolidation had not taken place.

[*N.J.S.A.* 14A:10–6(e).]

Defendants argue that this statute does not apply because it does not specify that it includes punitive damages. However, it does not need to specify that it includes punitive damages because it applies to "*all* the obligations and liabilities" of merged or consolidated corporations, as well as "*any* claim existing or action or proceeding pending." *N.J.S.A.* 14A:10–6(e) (emphasis added). Moreover, contrary to defendants' assertion, at least one New Jersey court has interpreted *N.J.S.A.* 14A:10–6(e) to apply to punitive damages. *See Brotherton v. Celotex Corp.*, 202 *N.J.Super.* 148, 155, 493 *A.*2d 1337 (Law Div.1985) (defendant's predecessor concealed knowledge of the health risks of exposure to asbestos).

Defendants next argue that the judge erred in failing to require that the jury base punitive damages on the value of the Bank at the time of its wrongdoing, i.e., when plaintiffs were terminated in 1991.

When the jury determined to award punitive damages, plaintiffs' attorney announced that she was "not prepared to go forward on establishing the financial worth of the defendant" because the defense had ignored plaintiffs' requests to produce. Plaintiffs' counsel represented that she had obtained a copy of the annual report of Corestates Financial Corp., and could produce a tax attorney and CPA to interpret it. Defense counsel argued that this information did not "speak to the National State Bank." The judge responded, "if you have more accurate information that you would like to produce you're welcome to do so[;] otherwise I have to accept whatever the best evidence available is." Defendants' counsel noted his objection, adding "I don't believe that this

National State Bank can be valued, as it must be for purposes of ... the punitive damages issue."

Defendants' counsel then agreed to "stipulate that the value of the stock exchanged by [Corestates] Financial Corp. to Constellation [Bankcorp.] had a value of 282 million." Nevertheless, he reiterated that this figure was "not relevant to the issue of damages here, because it doesn't speak to the National State Bank."

In accordance with defendants' counsel's representation, the judge charged the jury:

On March 16th, 1994, Core States Financial Corp. merged with Constellation Bank Corp.. . Core States Financial Corp. exchanged 11.2 million shares of common stock valued at approximately $280 million with Constellation Bank Corp. So when they took them over they gave them $280 million of their stock.

The trading value of that stock on the New York Stock Exchange was approximately $25 per share back on March 16, 1994 when the exchange took place. The current trading value of Core States Financial Corp. on the New York [S]tock [E]xchange is 39 and 1/8th per share, which would make that 11.2 million shares now [worth] $438.2 million.

Defendants made no objection to this charge.

Plaintiffs stress that defendants' failure to respond to discovery requests regarding financial information, and their subsequent stipulation to the value of the Bank, preclude defendants from claiming that the subject of the stipulation is incorrect. Defendants respond that plaintiffs' attempted pretrial discovery was untimely; defendants were coerced into entering into the stipulation in order to avoid the testimony of plaintiffs' proposed expert; and the fact that there was a stipulation does not make its subject relevant.

The record reveals no evidence that the stipulation was reached under "heavy-handed and unfair circumstances," as defendants contend. To the contrary, the judge made every attempt to resolve defendants' counsel's objections, inviting him to produce "more accurate information," and asking him to "offer a reasonable solution." Defendants' counsel's response was that the Bank could not be valued. His position was unreasonable. Also, de-

spite possible tardiness of plaintiffs' discovery requests, defendants chose not to respond. Thus, the judge correctly concluded that "the defense created the problem" and was guilty of "stonewalling." Nevertheless, the judge remained willing to accommodate defendants.

The judge charged the jury that it must consider, among other factors, defendants' "financial condition and wealth," and "ability to pay." This was in accordance with *Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 345, 627 *A.*2d 1081 (1993), in which the Court, noting the necessity of evidence of defendant's financial condition to support punitive damages, commented: "From the purposes of punitive damages—punishment and deterrence—we glean that 'financial condition' roughly means the ability to pay."

In *McDonough v. Jorda,* 214 *N.J.Super.* 338, 349, 519 *A.*2d 874 (App.Div.1986), *certif. denied,* 110 *N.J.* 302, 540 *A.*2d 1282 (1988), *cert. denied, Jorda v. City of New Brunswick,* 489 *U.S.* 1065, 109 *S.Ct.* 1338, 103 *L.Ed.*2d 809 (1989), this court explained that a jury must consider the wealth of the defendants in assessing punitive damages, because "the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person." Defendants incorrectly argue that the facts in *McDonough* are "strikingly similar" to the facts here. In *McDonough,* there was no evidence whatsoever "on the ability of the wrongdoers to pay any award," nor was there any "ruling or instruction by the court." *Id.* at 349, 519 *A.*2d 874. Here, in contrast, the value of the stock of the Bank's successor was stipulated, and the jury was correctly instructed on punitive damages.

Furthermore, "ability to pay," as stated in *Herman, supra,* 133 *N.J.* at 345, 627 *A.*2d 1081, implies current ability to pay. In *Herman,* the Court accepted the value of defendant's stock a year after the occurrence of the wrongful conduct, together with the gross sales of the entire company and the product that injured plaintiff, for an unspecified year, as "not overwhelming" but

"sufficient to support an award of punitive damages." *Id.* at 346, 627 *A.*2d 1081.

In *Ward v. Zelikovsky,* 263 *N.J.Super.* 497, 513, 623 *A.*2d 285 (App.Div.1993), *rev'd on other grounds,* 136 *N.J.* 516, 643 *A.*2d 972 (1994), a defamation case, the wrongful conduct occurred in 1989, and this court approved income tax returns for four years, 1988 through 1991, to prove the extent of defendant's wealth for punitive damages. We noted that "defendant offered no evidence of his liabilities to dispute the picture of his financial circumstances shown by the returns." *Ibid.*

In *Ward,* we accepted evidence of the defendant's financial condition for the three years following the wrongful conduct. The Court in *Herman* accepted evidence of the defendant's financial condition one year after the wrongful conduct. Likewise, the valuation of the Bank in March 1994, two years and five months after plaintiffs' termination in October 1991, should also be accepted.

■ The judge did not err in accepting the parties' stipulation of the value of the Bank's successor when it was purchased in 1994 as the basis for the award of punitive damages.

## IV.

■ Defendants object to the admission of evidence concerning the job performance of Shannon and Castillo, when they replaced plaintiffs as the managers of the Fords and Perth Amboy branches. Defendants reason that events that occurred after plaintiffs' terminations could not have influenced the decision to discharge plaintiffs, and thus were irrelevant. The trial judge allowed the disputed evidence, reasoning that "[t]he age, gender and performance of the successor before and after the fact is relevant ... as to both credibility and state of mind of the corporate entity."

We agree that Ahern and Campbell could not have considered events that had not yet occurred when they decided to terminate plaintiffs. Nevertheless, as the judge explained, proof that their

decision was "terribly bad" might impair their credibility and form the basis for an inference that they intended to discriminate. It was, therefore, relevant.

*Walther v. Lone Star Gas Co., supra,* an age discrimination case, is analogous to the situation here. Plaintiff was a fifty-year-old manager with satisfactory or better job performance during his thirty years with defendant company when he was discharged in a RIF. 952 *F.*2d at 121. Although defendant claimed that it terminated plaintiff because of his performance, plaintiff proved that "several other younger, less qualified employees whose positions had been eliminated were retained and transferred or promoted to positions that Walther was qualified to fill and had in fact filled in the past." *Id.* at 122. Noting that an employer may decide for itself which employees are better qualified, the court said: "Nevertheless, a plaintiff can take his case to a jury with evidence that he was clearly better qualified than younger employees who were retained." *Id.* at 123.

This is what plaintiffs did here; they proved that they were clearly better qualified than Shannon and Castillo, younger employees who were retained and transferred to the positions in which plaintiffs were successfully performing. The poor performance of Shannon and Castillo after plaintiffs' terminations was part of plaintiffs' proof that plaintiffs were clearly better qualified.

Moreover, the evidence revealed a sharp difference in defendants' treatment of Shannon and Castillo in comparison to plaintiffs. Castillo was retained despite his failure to meet expectations in six out of seven categories on his performance review. Shannon received several warnings because of her own poor performance, but was not immediately discharged. Plaintiffs, however, were each terminated for only a review of "meets most expectations," which they were told was not even a bad evaluation.

Evidence of disparate treatment is relevant and admissible because it forms the basis for the inference of a discriminatory motive. " 'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people

less favorably than others because of their ... [protected characteristics]. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Hampton v. Borough of Tinton Falls Police Dep't*, 98 *F.*3d 107, 112 (3d Cir.1996) (quoting *International Bhd. of Teamsters v. United States*, 431 *U.S.* 324, 335 n. 15, 97 *S.Ct.* 1843, 1854 n. 15, 52 *L.Ed.*2d 396, 414 n. 15 (1977)).

Defendants' reliance on *Johnson v. Yellow Freight Sys., Inc.*, 734 *F.*2d 1304, 1310 (8th Cir.), *cert. denied*, 469 *U.S.* 1041, 105 *S.Ct.* 525, 83 *L.Ed.*2d 413 (1984) and *Glover v. Canada Dry Bottling Co.*, 1990 WL 43739 at *2 (D.N.J.1990) is misplaced. Here, the evidence of the poor performance of plaintiffs' replacements was not submitted to disprove defendants' proffered reason for terminating plaintiffs. It showed that plaintiffs were clearly better qualified than the younger people who replaced them, as well as disparate treatment between older and younger employees. Here as in *Johnson*, the judge's decision was not an abuse of discretion. *See Dinter v. Sears, Roebuck & Co.*, 252 *N.J.Super.* 84, 92, 599 *A.*2d 528 (App.Div.1991) ("admission or exclusion of proffered evidence is within the discretion of the trial judge whose ruling is not disturbed unless there is a clear abuse of discretion.").

## V.

[Section V, which addresses whether the jury verdict was against the weight of the evidence, has been omitted for publication purposes.]

## VI.

[Section VI, which discusses the award of counsel fees, has been omitted for publication purposes.]

Affirmed on both the direct and cross appeals.