736 A.2d 462

ANN BAKER AND BARBARA HAUSLEITER, PLAINTIFFS–RE-
SPONDENTS, v. THE NATIONAL STATE BANK, NEW JERSEY
NATIONAL BANK (A/K/A CORESTATES) ITS SUCCESSOR-IN-
INTEREST, LEO AHERN, REG. MGR. OF NSB AND INDIVIDU-
ALLY, ARTHUR CAMPBELL, FORMERLY EXEC. V.P. OF NSB
AND INDIVIDUALLY, DEFENDANTS–APPELLANTS.

Argued March 15, 1999—Decided August 10, 1999.

*Cynthia M. Jacob* argued the cause for appellants (*Collier, Jacob & Mills,* attorneys; *Ms. Jacob* and *Allan G. Lesnewich,* of counsel; *Ms. Jacob, Mr. Lesnewich, David H. Ganz* and *Sandra N. Fears,* on the briefs).

*Patricia Breuninger* argued the cause for respondents (*Breuninger & Fellman,* attorneys; *Ms. Breuninger* and *Laura LeWinn,* on the brief).

PER CURIAM.

The central issue in this employment discrimination case concerns when victims of workplace discrimination may recover punitive damages. That issue is similar to the primary issue in *Cavuoti v. New Jersey Transit Corp.,* 161 *N.J.* 107, 735 *A.2d* 548

(1999), also decided today. The relevant principles set forth in that case will be applied here. *See Cavuoti, supra,* at 116–29, 735 A.2d 548.

██ Our decision in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 A.2d 445 (1993), "established two distinct conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under the [the New Jersey Law Against Discrimination]." *Rendine v. Pantzer,* 141 *N.J.* 292, 313, 661 A.2d 1202 (1995). Those two requirements are (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.' " *Id.* at 314, 661 A.2d 1202.

██ In this case the jury awarded substantial punitive damages to the prevailing party. The pivotal issue is whether the instruction to the jury insured that the *Lehmann* prerequisites for punitive damages were met. Without objection, the trial court submitted the case to the jury without a specific instruction that jurors were required to find that there had been actual participation in, or willful indifference to, the wrongful conduct on the part of upper management. Because the issue arises as plain error under *Rule* 2:10–2, the question is whether the omission of the *Lehmann* upper-management charge was clearly capable of producing an unjust result. We find that because wrongful conduct was committed by employees who were so clearly members of upper management, the error could not have produced an unjust result. There is also a question of whether a successor business entity may be held liable for punitive damages assessed against the predecessor. We answer that question in the affirmative on the basis that the successor had, by law, agreed to assume the liabilities of its predecessor. We will only briefly discuss other issues raised in this case.

I

When they were terminated in 1991, plaintiffs Ann Baker and Barbara Hausleiter were branch managers of The National State

Bank (the Bank). The Bank allegedly terminated them as part of a reduction in force (RIF) that the Bank implemented because of its failing financial condition. Defendants Leo Ahern, one of the Bank's regional managers, and Arthur Campbell, the Bank's vice-president in charge of branch operations and community banking, chose plaintiffs for termination. At the time of their terminations, plaintiff Baker was fifty-four years old, and plaintiff Hausleiter was forty-nine years old.

Each of the plaintiffs had been career employees of the Bank. Each had received generally favorable performance ratings, although their branches had been performing less satisfactorily. At the time of the RIF, each was assured that her termination had nothing to do with job performance; it was simply that their jobs had been eliminated. Each, however, was replaced in the same job by a younger and less experienced person.

Both plaintiffs filed complaints with the Law Division under the LAD, alleging age and sex discrimination. At trial, the Bank officer testified that the Bank had reported operating losses of $60 million in the first quarter of 1991. In order to comply with Directives of the Office of Comptroller of the Currency, the Bank was forced to implement a plan that required reorganization, consolidation, branch closings, and a RIF. In September 1991, Campbell told Ahern that about ten percent of the Bank's workforce had to be eliminated, and that Ahern had to review personnel files in his region for termination. Ahern testified that after discussing plaintiffs Baker and Hausleiter in relation to the RIF, Campbell said that both plaintiffs "have to go." In total, the Bank terminated 147 employees.

The Bank's parent company at the time of plaintiffs' terminations was Constellation Bancorp. In March 1994, CoreStates merged with Constellation by acquiring Constellation's stock. At the time of the 1996 trial, CoreStates/New Jersey National Bank was the successor-in-interest to the Bank.

The jury found that Baker's dismissal was the result of age and gender discrimination, and that Hausleiter's dismissal was the

result of age discrimination. The jury awarded Baker a total of $135,740 in compensatory damages, and awarded Hausleiter a total of $102,241 in compensatory damages. The jury also found that the Bank was liable to plaintiffs for punitive damages in the amount of $4 million. Baker and Hausleiter agreed to share equally in the punitive damages award, at $2 million each. The trial court also awarded plaintiffs attorneys' fees and costs, totaling $331,741.00. After the entry of the verdict, the trial court ordered that plaintiffs' complaint be amended to include CoreStates/New Jersey National Bank as the successor-in-interest to the Bank.

Both parties appealed to the Appellate Division. The Appellate Division affirmed the jury's verdict, the award of punitive damages, and the award of counsel fees in all respects. 312 *N.J.Super.* 268, 711 *A.*2d 917 (1998). It ruled that CoreStates was incorrect in its assertion that a successor corporation may not be liable for punitive damages assessed against its predecessor. Additionally, the Appellate Division acknowledged that the charge below omitted the proper upper management instruction. However, it concluded that this omission was not capable of producing an unjust result due to the overwhelming evidence that the party or parties responsible for plaintiffs' terminations were members of the Bank's upper management. We granted the Bank's petition for certification. 156 *N.J.* 425, 719 *A.*2d 1023 (1998).

## II

### Application of the *Lehmann* Principles

In *Maiorino v. Schering–Plough Corp.,* 302 *N.J.Super.* 323, 695 *A.*2d 353 (App.Div.), *certif. denied,* 152 *N.J.* 189, 704 *A.*2d 19 (1997), the court observed that "a jury charge on punitive damages must include the instruction that upper management has to have ... participated in or shown willful indifference to the situation." *Id.* at 354–55, 695 *A.*2d 353 (emphasis added) (citing *Rendine, supra,* 141 *N.J.* at 315, 661 *A.*2d 1202). In fact, the court held that this concept is so essential to a fair trial that "the failure to charge

the jury with the necessity of finding upper management's involvement to justify a punitive award is such a fundamental flaw that [an appellate court] must recognize it as a matter of plain error." *Id.* at 354, 695 *A*.2d 353 (citation omitted). Although *Maiorino* is persuasive authority regarding the substantive correctness of a jury charge, it is well established that the question of whether plain error occurred depends on whether the error was clearly capable of producing an unjust result. Relief under the plain error rule, *R.* 2:10–2, at least in civil cases, is discretionary and "should be sparingly employed." *Ford v. Reichert*, 23 *N.J.* 429, 435, 129 *A*.2d 439 (1957).

Applying those principles, we can find no basis for concluding that the absence of an upper-management charge could have prejudiced the Bank. Campbell and Ahern were indisputably upper management because they were "top management" of the bank. *See Kolstad*, —— *U.S.* ——, 119 *S.Ct.* 2118, 2128, 1999 WL 407481 (U.S.Dist.Col.1999). Campbell was the Bank's Senior Vice–President in Charge of Branch Operations, and Ahern was the Bank's Regional Manager in charge of branch operations. No rational jury could have but concluded that they (the sole actors in the conduct) were part of upper management.

## III

### Successor Liability

We granted certification in large measure to address the concerns expressed in the Bank's assertion that the Appellate Division erroneously held that "the merger makes a successor *per se* liable for punitive damages."

We agree that New Jersey courts have consistently adhered to the principle that punitive damages are meant to punish a wrongdoer's egregious conduct and to deter that wrongdoer and others from engaging in such conduct in the future. To achieve that goal, our courts have held that it is the wrongdoer who is to be

punished, and it is the wrongdoer (among others) whose future conduct is to be deterred.

> Punishment, as a justification for punitive damages, is not proper when imposed on an innocent party. In addition, neither specific nor general deterrence is effective when used in this context. Specific deterrence is effective only when punitive damages are imposed on the guilty party. General deterrence also is frustrated.... The punishment of an innocent actor will have no positive effect on potential wrongdoers.
>
> [Keith A. Ketterling, *A Proposal for the Proper Use of Punitive Damages Against a Successor*, 11 *J. Corp. L.*, 765, 774 (1986) (footnotes omitted).]

The Seventh Circuit in *Musikiwamba v. ESSI, Inc.*, 760 *F.*2d 740, 749 (7th Cir.1985), used this approach to decide that a plaintiff in a discrimination case could not recover punitive damages from a successor. There, the court weighed the competing interests and found fairness dictated against punitive damages.

> The purpose of the [successor liability] doctrine is to ensure an employee is made "whole" when the predecessor has gone out of business. Punitive damages ... go far beyond this purpose.... [T]he key is to balance the interests of two innocent parties to achieve a clearly established national goal. That national goal is not better achieved by imposing punitive damages on an innocent successor, who may never have discriminated against an employee, and who is thus unlikely to be deterred by the imposition of substantial penalties.
>
> [*Ibid.* (citation omitted).]

In *Armstrong v. Lockheed Martin Beryllium Corp.*, 990 *F.Supp.* 1395, 1403 n. 9 (M.D.Fla.1997), the court made a similar finding:

> Under no circumstances can this court envision the imposition of punitive damage liability against an innocent successor. The conflicting interests of the parties and policies justifying successor liability and punitive damages all militate in favor of the successor company on such a claim.

We agree that a *per se* rule under the LAD imposing liability for punitive damages on successors would reflect a misunderstanding of successor liability in the discrimination context. Courts that have considered successor liability under the federal anti-discrimination laws have rejected the idea of "automatic" successor liability in favor of a fact-specific and equitable analysis. *See, e.g., EEOC v. MacMillan Bloedel Containers, Inc.*, 503 *F.*2d 1086, 1091 (6th Cir.1974), *on remand*, 1976 WL 553 (N.D.Ohio Mar.2, 1976) (successor's liability "is not automatic, but must be deter-

mined on a case by case basis"); *Coleman v. Keebler Co.*, 997 *F.Supp.* 1094 (N.D.Ind.1998) ("Successor liability is an equitable doctrine rather than an 'inflexible command,'and emphasis on the facts of each case ... is especially appropriate."); *EEOC v. Local 638*, 700 *F.Supp.* 739, 740 (S.D.N.Y.1988) ("[N]o definite set of obligations flows from any determination that one entity is a successor."); *see also Musikiwamba, supra*, 760 *F.*2d at 751 ("Imposing liability on a successor when a predecessor could have provided no relief whatsoever is likely to severely inhibit the reorganization or transfer of assets of a failing business.")

■ Because there was a "fact-specific" and "case-by-case" analysis made here, we find no policy concern for the imposition of successor liability. This is not a case in which successor liability has been imposed by judicial mandate.[1] Successor liability falls on CoreStates Bank because it agreed by law to assume the liabilities of its predecessor. There is no dispute that CoreStates and Constellation Bancorp., the parent company of the Bank, merged under *N.J.S.A.* 14A:10–6. When such a merger or consolidation becomes effective: "[T]he surviving or new corporation shall be liable for all the obligations and liabilities of each of the corporations so merged or consolidated...." *N.J.S.A.* 14A:10–6(e). Proof of a merger is sufficient to establish liability under *N.J.S.A.* 14A:10–6. *See Brotherton v. Celotex Corp.*, 202 *N.J.Super.* 148, 493 *A.*2d 1337 (Law Div.1985).

## IV

### Punitive Damages Award

In this case, there was a lump sum award of punitive damages that the plaintiffs have agreed to share equally. There is some-

---

[1] In *Lefever v. K.P. Hovnanian Enterprises, Inc.*, we observed that it would be unfair to impose punitive damages on a successor unless the successor's independent action provided a basis for liability. 160 *N.J.* 307, 326 n. 4, 734 *A.*2d 290 (1999). "In order for punitive damages to be appropriate, the successor must be 'sufficiently connected to the culpable conduct.'" *Ibid.* (quoting *Brotherton, supra*, 202 *N.J.Super.* at 157, 493 *A.*2d 1337).

thing unsettling about that procedure.[2] The 1995 Punitive Damages Act (PDA), *L.* 1995, *c.* 142, although not applicable to this cause of action (which occurred before the act's effective date), requires that a court reviewing an award of punitive damages be satisfied that the award is "reasonable in its amount" and is justified in the circumstances of the case "in light of *the wrongful conduct.*" (Emphasis added). The policy judgment of the statute is sound. There were two distinct harms in this case, each of which the jury should have assessed separately. We decline, however, to disturb the verdict on that basis because the procedure was expressly agreed upon by the parties. (Perhaps defendant preferred that the matter be viewed as one wrong rather than two.)

In future cases, close attention to the requirements of the PDA is mandated. Although the PDA excludes LAD actions from its cap, its general requirements for procedural and substantive fairness are mandated.

In addition, there are substantive constitutional limits on the amount of punitive damages that a jury may award. Prior to the 1990s, the United States Supreme Court had not ruled on the limits on the award of punitive damages in civil cases. The Supreme Court has since held that states are bound by the Due Process Clause of the Fourteenth Amendment to adopt procedures to ensure that punitive damages awards are made through a fair process that includes judicial review of awards. In *Honda Motor Co., Ltd. v. Oberg,* 512 *U.S.* 415, 114 *S.Ct.* 2331, 129 *L.Ed.*2d 336 (1994), the Court ruled that the absence of any judicial review of the fairness of the award of punitive damages violated procedural due process principles.

---

[2] In *Allen v. R & H Oil & Gas Co.,* 63 *F.*3d 1326 (1995), the Fifth Circuit observed that a plain reading of the Mississippi punitive damages statute disclosed that the punitive damages claim of each claimant would be separate and distinct, just as the compensatory damages claims of each claimant are separate and distinct.

In *BMW of North America, Inc. v. Gore*, 517 *U.S.* 559, 116 *S.Ct.* 1589, 134 *L.Ed.*2d 809 (1996), *on remand*, 701 *So.*2d 507 (Ala.), *reh'g denied* (1997), the Court, for the first time, employed substantive due process principles to invalidate a state court award of punitive damages. In *BMW v. Gore*, a jury awarded the plaintiff $4000 in compensatory damages and $4 million in punitive damages for misrepresenting that the paint on plaintiff-doctor's BMW was new, when in fact the vehicle had been damaged by weather, repaired, and repainted. The majority in *BMW v. Gore* found that courts must examine the substantive basis of the punitive damages award to determine whether it is so excessive as to violate due process. The Court did not, however, establish a clear-cut rule. The Court stated: "We are not prepared to draw a bright line marking the limits of a constitutionally acceptable punitive damages award." *Id.* at 585, 116 *S.Ct.* at 1604, 134 *L.Ed.*2d at 832. Instead, the majority concluded that courts must consider three factors when examining the size of a punitive damages award:

> the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

> [*Id.* at 575, 116 *S.Ct.* at 1598–99, 134 *L.Ed.*2d at 826.]

■  Justice Pollock once observed:

> We have proceeded [in this area] with an appreciation that at the core of punitive damages lurks a volatile dilemma: the same findings necessary for the award of punitive damages can incite a jury to act irrationally. A condition precedent to a punitive-damages award is the finding that the defendant is guilty of actual malice. The purposes of the award—the deterrence of egregious misconduct and the punishment of the offender, *Leimgruber v. Claridge Assocs., Ltd.*, 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977)—when mixed with a finding that the defendant is malicious, can readily inflame an otherwise-dispassionate jury. Essential to a fair and reasonable award therefore is the consideration of all relevant circumstances, including the nature of the defendant's misconduct and the harm to the plaintiff. *Id.* at 456, 375 *A.*2d 652. Stated generally, the award of punitive damages "must bear some reasonable relation to the injury inflicted and the cause of the injury." *Id.* at 457, 375 *A.*2d 652.

[*Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 337–38, 627 *A.*2d 1081 (1993).]

In future LAD cases, courts reviewing punitive damages awards should apply both the requirements of the PDA (with the exception of the statutory cap) and the substantive standards of *BMW v. Gore* in order to ensure that any award of punitive damages bears "some reasonable relation" to the injury inflicted.

In this case we find that compliance with the substantive standards of *BMW v. Gore* was inadequately addressed by the trial court. At the motion for a new trial, the trial judge simply stated that "[a]warding $4 million in punitive damages against a $400 million entity does not offend the conscience of this court, especially considering tax ramifications." In the interests of justice, we remand the matter to the Law Division to reconsider and apply the standards of *BMW v. Gore.* The trial court should assess whether the award was either appropriate in light of "the degree of reprehensibility of the [wrongful conduct,] the disparity between the harm or potential harm [suffered by the plaintiff] and the plaintiff's punitive damages award[,] and the difference between this remedy and the civil penalties authorized or imposed in comparable cases," *BMW v. Gore, supra,* 517 *U.S.* at 575, 116 *S.Ct.* at 1598–99, 134 *L.Ed.*2d at 826, or whether the award reflects prejudice, passion, or mistake warranting a new trial on the amount of punitive damages. In this respect, an appellate court must accord deference to a trial court's "feel of the case" in assessing whether a miscarriage of justice occurred. *Carrino v. Novotny,* 78 *N.J.* 355, 361, 396 *A.*2d 561 (1979). In considering the disparity between the harm suffered by plaintiffs and the amount of the award, the court may consider, but is not bound by, the Legislature's judgment of five times compensatory damages as a normative measure of the limits of proportion. Because some acts of discrimination cause unquantifiable harm, the assessment of proportion to harm may take into account whether there has been an outrageous affront to human dignity that warrants departure from a normative punishment.

V

Other Issues

■ We affirm the remaining issues substantially for the reasons stated by the Appellate Division in its reported opinion. We agree that the trial court did not erroneously permit the jury to calculate punitive damages based upon the worth of a more financially-stable successor corporation that did not exist at the time of the wrongful conduct. In fairness, for the calculation of punitive damages, a defendant's financial condition should be measured at the time of the wrongful conduct. That was impossible to do in this case because of defendant's refusal to produce any information about the Bank's value in 1991. In short, there was nothing that the trial court could have done except to use the parties' stipulation concerning the value of the stock exchanged between Constellation Bancorp. and CoreStates in their merger on March 16, 1994. We also agree that there is no need in the case of a RIF to modify the requirements for establishing a *prima facie* case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973). We agree with the holding to that effect in *Marzano v. Computer Science Corp., Inc.*, 91 *F.*3d 497 (3d Cir.1996). In rejecting a requirement of additional evidence, the court noted that "[t]he evidentiary burden at [the *prima facie* stage] is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent. . . ." *Id.* at 508. To require "an additional showing" in order to establish a *prima facie* case in the RIF context, "subverts the analytical framework designed by the U.S. Supreme Court" in *McDonnell Douglas. Id.* at 507.

The judgment of the Appellate Division is affirmed except with respect to the amount of punitive damages. We remand that issue to the Law Division for reconsideration in light of this opinion.

*For affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.