744 A.2d 1186

MARTHA MOGULL, PLAINTIFF–APPELLANT, v. CB COMMER-CIAL REAL ESTATE GROUP, INC., GARY BEBAN, FRED SCHMIDT, JOHN FOSTER, JAMES J. DIDION, BOYD VAN NESS AND STEVEN FLEMING, DEFENDANTS–RESPON-DENTS, AND HAROLD APPEL, EDWARD HIGHERS AND JOHN DOES 1–5, (SAID NAMES BEING FICTITIOUS AND UN-KNOWN), DEFENDANTS.

Argued November 30, 1999—Decided February 16, 2000.

*Bruce L. Atkins,* argued the cause for appellant (*Contant, Scherby & Atkins,* attorneys; *Andrew T. Fede,* on the briefs).

*Donald P. Jacobs,* argued the cause for respondents (*Budd Larner Gross Rosenbaum Greenberg & Sade,* attorneys; *Carl Greenberg,* of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the issue whether jury instructions, jury interrogatories, and a verdict sheet regarding a defendant employer's burden of production in a sex discrimination case under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 to –42, so confused the jury that a reversal of plaintiff's verdict was required. Plaintiff Martha Mogull worked in the Hackensack office of defendant CB Commercial Real Estate Group, Inc. ("CB") for more than a decade. After a number of disputes about commissions owing to her, CB discharged her. In her suit, Mogull alleged that CB and a number of its employees[1] had discriminated against her in her employment and in the termination of her employment, in violation of the LAD. After a seven-week trial, the jury awarded Mogull $1.5 million in compensatory damages and $5 million in punitive damages. The Appellate Division reversed the verdict and remanded for a new trial. 319 *N.J.Super.* 53, 724 *A.*2d 863 (1999).

I.

Martha Mogull was the first woman ever to be named an associate vice president in the commercial division of CB. Mo-

---

[1] Individual defendants are Gary Beban, CB's President and a member of the Board of Directors; Fred Schmidt, the Resident Manager at CB's Hackensack office from 1990–92; John Foster, CB's Hackensack Resident Manager from July 1992 through plaintiff's termination; James J. Didion, CB's Chief Executive Officer and a member of the Board of Directors; Boyd Van Ness, in 1982, CB's Northeast Regional Manager, and CB's Eastern Division Manager from March 1987 through plaintiff's termination; Edward Highers, the Hackensack Resident Manager in 1982; Steven Fleming, a Sales Manager in Hackensack from July 1988 to May 1989, and then Resident Manager of CB's Piscataway office; Harold Appel, the only Vice–President/Salesperson, other than plaintiff, in CB's Northeast Region.

gull's career in commercial real estate began in the firm of Brunell Kramer. At the recommendation of a client, she left that firm and took a job at Sutton & Towne in Paramus under the managing partner, Harold Appel.

Appel trained Mogull. She worked on some of his transactions, doing leg work and asking him for help when she needed it. On those transactions, they shared the salesperson's portion of the commission equally. Each worked independently on other transactions as well. Appel and Mogull had a brief affair in 1977 and 1978, but they were able to continue working together after it ended amicably.

When CB purchased Sutton & Towne in 1980, both Mogull and Appel worked in CB's Hackensack office. Appel became a vice president for CB, and Mogull worked under a "Broker–Salesman Contract" that provided that "Broker agrees to provide to Salesman all current listings in the office except such as Broker may find expedient to handle itself or to place solely with another salesman or salesmen." Mogull was named associate vice president in 1986, in recognition of having had sales of more than $100,000 for five of the previous six years. She was one of the top ten salespeople in CB's Hackensack office from 1981 to 1990, and was five times in the top five. Nevertheless, in her twelve years at CB, Mogull received only two leads from CB's management, one in exchange for agreeing not to pursue a complaint.

## A.

### *Transactions*

Mogull's claim of denial of employment benefits centers on real estate transactions with three clients: a) Edwards & Kelcey; b) CBS; and c) Allstate.

#### 1. *Edwards & Kelcey*

In 1978 when Edwards & Kelcey ("E & K") entered into a long-term lease, both Appel and plaintiff shared equally in that commis-

sion. E & K had been looking unsuccessfully for new space for several years, until Mogull arranged for a developer (a neighbor of hers) to build E & K a building in Livingston. Appel, who had an exclusive representation agreement with E & K, decided to split the commission equally with Mogull because she was energetic and bright and he "wanted to help her along and ... promote the company." E & K occupied half of the building and gave Mogull an exclusive to lease the rest of the space, which she and Appel did, sharing those commissions. When Mogull later found E & K a warehouse, she also split the commission with Appel. In 1983 or 1984, Appel, without Mogull, did some out-of-state deals with E & K. At about the same time, E & K expanded its office space in Livingston, and Mogull, who should have split her commission on that transaction with Appel, did not.

In 1991, Mogull learned that Appel was working with E & K and immediately complained to Arleigh Williams, her regional manager, that she was entitled to work on any E & K deal. Appel, in turn, sought his share of the 1984 expansion commission. Nearly a year later, Williams responded in a memorandum, explaining that, in 1991, E & K had been "out in the marketplace with other brokers," and that Appel, by making a presentation with CB's resident manager, had "regained control" and won E & K back. Appel explained that the person in charge of real estate matters at E & K was retiring, and after meeting with the new vice president he had secured a new exclusive. Appel did not tell Mogull, because it was a new deal and they were no longer working together. Fred Schmidt, then resident manager of CB's Hackensack office, corroborated Appel's account.

Williams resolved the dispute by telling Mogull that she had the option to choose either (a) thirty percent of the commission if the client renewed its lease, but none of the commission if the client relocated, or (b) twenty percent of the commission, regardless of whether the client renegotiated or relocated. Mogull responded that both options were unacceptable, that E & K was her account, and that she was "a fifty percent partner whether they renegotiate

or relocate." On further review, Williams decided that Mogull and Appel would split the commission equally if E & K renewed, but that she would receive only twenty percent of the total commission if they relocated. Williams also reversed a previous decision and awarded Appel a commission of $2429 on the 1984 expansion. When E & K eventually relocated, Mogull received a commission of $67,000, twenty percent of the total commission of $334,800. She claimed that CB therefore owed her $100,000.

### 2. CBS

In 1990, Mogull learned that in 1987 Appel had improperly excluded her from a deal with CBS, on which she should have received a $75,000 commission. Several years earlier, she had leased space to CBS in Secaucus. The landlord, Hartz Mountain, had agreed that Mogull would get a commission if CBS took more space at that location. In April 1990, Mogull discovered that there was a second deal between CBS and Hartz Mountain, and in a memo to John Anderson, her resident manager, she asked for her share of that commission. Anderson's replacement wrote to Mogull advising her that no commission was due her because the two transactions were distant in time, and that Hartz Mountain was not the landlord in the second lease.

Appel stressed that CBS had been his client before plaintiff joined the firm. He explained that the landlord in the second transaction was Meadowlands Parkway Association, not Hartz Mountain, but admitted that correspondence to the new landlord was addressed care of Hartz Mountain, and that the lease involved space in the same development.

### 3. Allstate

During the 1980s, Allstate was a substantial client for Mogull, who procured four offices of approximately 20,000 square feet, and a 40,000 square foot office for Allstate. The Allstate manager appreciated Mogull's work and regularly employed her services as she was willing to meet his smaller requirements. Mogull even

did one emergency deal for Allstate without a fee, in order to build her relationship with the company. When Allstate was planning a major relocation in New Jersey, Mogull prepared a summary of her deals for another CB salesman to submit in connection with the relocation. A meeting with Allstate's management, plaintiff, and other CB agents was arranged.

CB's policy was to assign a salesperson with a previous relationship with a national client to that client's projects in the salesperson's area so long as the assignment met the client's needs. Mogull expected that she would choose the team to work on the major relocation project but, one or two days before the meeting, she received a message telling her not to come to the first meeting with Allstate on that project. Mogull later learned that Appel, who had not worked with Allstate previously, had been selected for the team.

Jack Weber, CB's national account manager for Allstate, explained that two senior Allstate real estate people had called him regarding the New Jersey relocation. Weber understood that they were interviewing three different firms for the relocation and they told him that they wanted a high-profile broker for the deal. Local managers decided that Steve Fleming, then manager at CB's Piscataway office, would pick the sales team. Weber made no investigation into other transactions in the area involving Allstate, but Fleming discovered that Mogull had worked with Allstate in the past. Fleming asked Weber to ask Allstate whether they wanted Mogull on the team, but no one at Allstate's national office knew who she was. Fleming then concerned himself with putting the "strongest players on the team." His brokers who had relationships with Allstate had done small deals with them, so he looked to Hackensack for salespeople with stronger resumes. Appel was the top salesperson in CB's Hackensack office for every year but one from 1983 to 1992, and was among the top three percent of CB salespeople nationwide for nine straight years. Fleming could recall no other situation in

which a salesperson with a local relationship had been left off the team.

Mogull complained to Fleming about being left off the team, and Fleming reported that it was Weber's decision. Mogull asked whether Van Ness, then CB's Eastern Division Manager, was Weber's boss, and Fleming responded that Gary Beban, CB's President, was as well. Mogull complained of discrimination to Anderson and Williams, and Williams told her that Allstate had asked for Appel, which he later admitted was incorrect. Mogull called Williams again and said "if I weren't a woman, this wouldn't happen to me," and Williams answered, "if that's the way you feel then we have nothing to talk about."

## B.

### *Termination*

In 1990, Mogull met with Williams in an effort to resolve her difficulties with the firm. Williams described a December 1990 meeting as a "litany ... of wrongs," in which Mogull displayed an "almost obsessive" animus towards Appel. Williams arranged a meeting between Mogull and Van Ness the following February. During that meeting, which lasted more than two hours, Van Ness denied knowing that Allstate was Mogull's account. Van Ness described the meeting as "about the most unpleasant experience that I've ever had," and Mogull admitted that she had insulted and degraded him. Eventually, Beban was assigned to carry out an investigation of Mogull's discrimination claims and determined them to be unfounded. Beban, however, only reviewed Mogull's claim regarding the Allstate transaction, and concluded that her dislike of Appel was at the core of all of her complaints. Beban later sent Mogull a memorandum informing her that her "personal disposition toward [Appel] is at the heart of this problem [and] this disruption must end." Mogull denied Beban's allegations, but acknowledged that her commissions fell from $98,000 in 1989 to $31,000 in 1990 and $54,000 in 1991. Those totals were among the

lowest in the Hackensack office, as were her earnings of $46,000 in 1988 and $26,000 in 1992.

In early 1992, Mogull also met with Schmidt, her resident manager from 1990 through mid–1992, and Williams. Schmidt advised her to stop thinking about lost clients and relationships and to canvass or cold-call for clients, as those procedures provided the bulk of the office's business. Schmidt also advised Mogull that she was disrupting the office. John Foster succeeded Schmidt as resident manager in July 1992, with the mission of shaking up the struggling Hackensack office. Foster sought to meet with Mogull, and after she canceled a number of appointments with him, they met on October 9, 1992. After the meeting, Foster wrote a memo to Mogull's file stating that Mogull was "out of touch with reality" and had said that she was burned out and would not canvass.

On October 15, 1992, Foster fired Mogull. In a memorandum to plaintiff's file dated October 26, 1992, Foster stated that her firing resulted from her mental attitude, her statement that she was burned out, her statements that CB took business away from her, her dependence on leads and her refusal to canvass. Van Ness denied taking part in the firing.

II.

Mogull filed suit in the Law Division, Bergen County, on August 20, 1993, alleging that she had been discriminated against on the basis of sex in violation of the LAD. She complained that CB removed her from transactions in favor of male salespeople after she had developed business relationships with clients, deprived her of leads that were given instead to junior male salespeople, and violated agreements to split fees with her, causing damage to her income and reputation. Mogull also alleged that she was wrongfully discharged on October 15, 1992. Additionally, Mogull accused Appel of participating in the discriminatory actions and, separately, of breaching an agreement to allow Mogull to work with a specific client. She demanded compensatory and punitive

damages, attorneys' fees, and costs. Other claims were dismissed on summary judgment, as were complaints against defendants Edward Highers and James J. Didion.

CB denied the material allegations of the complaint and alleged in its answer that Mogull was terminated for legitimate business reasons. CB also counter-claimed, alleging breach of the duty of loyalty, breach of contract, and interference with prospective economic advantage. Mogull denied the allegations of the counter-claim. Before trial, the trial court summarily dismissed a number of Mogull's claims as time-barred, but denied summary judgment on the question whether incidents underlying the time-barred complaints constituted continuing violations.

The matter was tried for approximately seven weeks before a jury. At the close of all the evidence, defendants moved to dismiss the discrimination claims against the remaining individual defendants, arguing that there was no evidence of discrimination by them. The court granted the motion (except as to Appel) because the individuals were acting within the scope of their employment; they were not seeking personal gain; and punitive damages could be assessed against the company without the individuals. The court also granted Mogull's motion to dismiss the breach of loyalty claim because CB had not proved any damages.

In response to interrogatories, the jury found that Appel was liable to plaintiff for breach of contract, and awarded plaintiff $87,201.07 on that claim. The jury determined that "plaintiff was denied benefits relating to" three separate transactions, CBS, Allstate and Edwards & Kelcey, and awarded plaintiff $500,000 on those claims. Finally, the jury found that plaintiff was performing her job at a satisfactory level when she was terminated; male employees with comparable work records were retained; and defendant failed to articulate any legitimate, non-discriminatory reason for its termination decision. Plaintiff was awarded $1,000,-000 on that claim.

Defendant moved to dismiss the claim for punitive damages, arguing that there was no evidence of any ill will or evil intent on

its part. The court denied the motion, reasoning that it was up to the jury to make that determination. After a separate proceeding, the jury awarded plaintiff $5,000,000 in punitive damages.

On December 2, 1996, an order was entered in favor of plaintiff and against defendant in the amount of $6,711,460, including prejudgment interest on the compensatory damages. In addition, $99,494, including prejudgment interest, was awarded against Appel. The trial court added $211,460.13 in prejudgment interest, $14,249.10 in taxed costs, and $624,150.20 in counsel fees.

CB moved for a new trial, judgment notwithstanding the verdict, and remittitur, arguing that the interrogatory asking whether CB had articulated legitimate nondiscriminatory reasons for its actions should not have been submitted to the jury, and that the charge on that point was confusing. CB also objected to the admission of statistical evidence of gender discrimination in its hiring and compensation to prove Mogull's claim, and argued that punitive damages should not have been awarded, there having been no egregious conduct. The court denied the motion, citing numerous federal cases from outside New Jersey for the admission of statistical evidence in proving discrimination and concluding that the evidence supported the jury's findings. On the question of punitive damages, the court found that there was evidence of egregious conduct in which CB's upper management participated. The order denying the motion was entered March 27, 1997. Defendants appealed from the December 2, 1996, and March 27, 1997 orders, and Mogull cross-appealed.

CB contended in its appeal that (1) the jury instructions and verdict form improperly shifted the burden of proof to it; (2) the jury's finding that defendant failed to articulate legitimate reasons for its actions was against the weight of the evidence; (3) and (4) statistical evidence and evidence of a continuing course of disparate treatment should have been excluded; (5) defendant was entitled to judgment notwithstanding the verdict on the question of plaintiff's termination because plaintiff's performance was not satisfactory and she was not replaced by a male; (6) evidence of

plaintiff's future damages should have been excluded; (7) defendant's counterclaim for breach of loyalty was erroneously dismissed; (8) the award of punitive damages was improper because there was no participation by upper management and there was no egregious conduct, and the award was excessive as well; and (9) the award of attorney's fees incorrectly included time spent on other claims and the twenty percent fee enhancement was excessive.

Mogull contended in her cross-appeal that the court erred in (1) excluding her evidence of back pay; (2) dismissing the individual defendants; (3) declining to award costs for expert witnesses; and (4) failing to award more than the twenty percent enhancement of attorney's fees.

The Appellate Division held that the jury instructions together with the interrogatories and verdict sheet regarding CB's burden of going forward with nondiscriminatory legitimate reasons for challenged employment actions contained such fundamental errors that reversal of the entire verdict was required. *Mogull, supra,* 319 *N.J.Super.* 53, 724 *A.*2d 863. The panel affirmed the dismissal of the complaints against all the individual plaintiffs, except Appel, and reversed and remanded for a new trial only against CB. The court instructed that if CB presented the same evidence at the new trial, "the LAD liability portion of the jury charge and the corresponding jury interrogatories as to denial of employment benefits and discharge based on sex, should focus solely on the pretext and intent analysis." *Id.* at 72, 724 *A.*2d 863.

We granted Mogull's petition for certification, 161 *N.J.* 150, 735 *A.*2d 575 (1999).

### III.

This case is one of gender discrimination established by indirect proof. *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973), outlined the procedure for indirectly proved cases of unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* § 2000e–2 (Title VII). This

Court has applied the same test to claims brought under LAD since *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 389 *A.*2d 465 (1978). In two cases applying the *McDonnell Douglas/Peper* test, we stated that

the prima facie case is established as follows: the employee must prove "[1] that he was in the protected * * * group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." Once the prima facie case has been established, the McDonnell Douglas analysis is followed in all other respects.

[*Clowes v. Terminix Intern., Inc.,* 109 *N.J.* 575, 597, 538 *A.*2d 794 (1988).]

Establishment of the *prima facie* case gives rise to a presumption that the employer unlawfully discriminated against the applicant. The burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the employee's rejection. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination.

[*Andersen v. Exxon,* 89 *N.J.* 483, 492–93, 446 *A.*2d 486 (1982).]

The controversy in this case turns on the second stage, in which the defendant has the burden of going forward to advance or articulate one or more legitimate nondiscriminating reasons for its actions. The jury found that CB had failed to do so.

Defendant asserts, and the Appellate Division agreed, that the jury made that finding because the charge and special interrogatories and verdict sheet were so confusing that the jury was led to believe that CB had to prove its articulated nondiscriminatory reasons by a preponderance of evidence. Essentially, defendant alleges that those faulty charges and interrogatories so confused the jury that it could not properly determine whether defendant had met its burden of production. Defendant also argues as a matter of law that the burden required was met and that the question of articulating reasons sufficient to overcome Mogull's presumption should not have been submitted to the jury.

Plaintiff responds that the jury charge, in its entirety, was proper and cured any defect in the interrogatories. We agree.

## IV.

### A.

### *The Charge*

Specifically, the court charged the jury on what Mogull would have to prove as follows:

In order to state an initial case in discrimination, the plaintiff must have proven each of the elements listed. Failure to prove even one of those elements means the plaintiff has failed to state an initial case as to any particular claim. If you find that the plaintiff has not met all of these elements, you must find that the plaintiff has failed to state a particular claim for discrimination and return a verdict for the defendant on that particular issue of discrimination.

If on the other hand you find that the plaintiff has met all of the elements of the initial case, you must then proceed to consider the next component of a discrimination case. If plaintiff proves by a preponderance of the credible evidence that she has stated an initial case by proving the necessary components as stated, the defendant then has the burden of going forward with evidence of legitimate nondiscriminatory reasons for its action, that action being such as denial of benefits, such as position or compensation.

If you do not find that the plaintiff has proven an initial case in support of any such claim, then you must return a verdict for the defendant on any such claim. If you find that the plaintiff has proven an initial case, you must determine whether the plaintiff also has satisfied her ultimate burden of proving intentional discrimination by defendant. Defendant maintains that it resolved the CBS and Edwards and Kelcey disputes and declined to place the plaintiff on the Allstate team and discharged the plaintiff because of legitimate articulated reasons.

I charge you that if true, such articulated reasons constitute a legitimate nondiscriminatory basis for defendant's action. Nevertheless, plaintiff may prevail on her claim or any particular claim if she has proven that such articulated reason or reasons are not—strike that—are merely a pretext for discrimination on any such claim. To prove pretext, plaintiff must show by a preponderance of the credible evidence that defendant's reason or reasons stated are not worthy of belief or that more likely than not, the reason or reasons given are not a true reason or the only true reasons for defendant's action and that plaintiff's sex, that is being a female, was a determinative motivating factor for defendant's action. In other words in order to prevail on any one of her claims, plaintiff must prove by a preponderance of the evidence that her sex was a determinative factor in the challenged treatment.

*Rule* 1:7–2 provides that "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict." CB made no objection during the charge conference or at any other time before the jury retired either to the jury instructions or the verdict sheet incorporating the description of

its burden of production. Accordingly, we must determine whether the trial court's decision was plain error, error "of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2.

The jury charge "should set forth an understandable and clear exposition of the issues." *Campos v. Firestone Tire and Rubber Co.,* 98 *N.J.* 198, 210, 485 *A.*2d 305 (1984). There is no reversible error "where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect." *Fischer v. Canario,* 143 *N.J.* 235, 254, 670 *A.*2d 516 (1996). The court repeatedly instructed the jury that Mogull, to prevail, had to prove all her allegations and so adequately conveyed the law of the ultimate issue to the jury. The court's charge tracks the language of the Model Jury Charge with near exactitude. *See* Model Jury Charge (Civil), §§ 2.21–2.23. That model, like the court's charge, repeatedly assigns the ultimate burden of proof to the plaintiff, and leaves no doubt that a plaintiff who fails to prove discrimination by a preponderance of the evidence loses.

In concluding that the jury might have been misled into believing that CB had to prove that its reasons were true, the Appellate Division quotes, for example, the trial court's statement that "all parties in this case have the burden of proving their allegations at trial." *Mogull, supra,* 319 *N.J.Super.* at 68, 724 *A.*2d 863. The Appellate Division also found fault with the trial court's direction that CB's articulated reasons for its actions with respect to the three transactions "*if true* [would] constitute a legitimate, nondiscriminatory basis for defendant's actions." *Id.* at 69, 724 *A.*2d 863.[2] Those statements did not manifestly overcome the court's insistence that Mogull bore the burden of persuasion.

Specifically, on the burden of persuasion, the court said:

---

[2] The Appellate Division, after acknowledging that instructions on the alternative claim of *retaliatory* as opposed to *discriminatory* discharge were correct,

the burden is on the plaintiff in a civil action such as this to prove every essential element of her claim or claims by a preponderance of the credible evidence....

If the proof should fail to establish any essential element of the plaintiff's claim by a preponderance of the credible evidence, the jury should find for any particular defendant as to such claim.

In this case, the plaintiff must prove by a preponderance of the evidence that her gender was a motivating factor in the defendant's adverse employment decision concerning her or decisions concerning her.

The court also charged the jury that defendant had no burden of persuasion, but was required only to articulate legitimate reasons for its actions: "If plaintiff proves by a preponderance of the credible evidence that she has stated an initial case by proving the necessary components as stated, the defendant then has the burden of going forward with evidence of legitimate non[-]discriminatory reasons for its action." The charge did not directly state or imply that defendant had any burden of proof; to the contrary, the court made it clear that the entire burden of proof was plaintiff's.

Contrary to defendant's assertion, the court also made it clear to the jury that defendant's reasons for its actions could be legitimate and non-discriminatory even if the jury disagreed with them or found them "unpalatable":

Simply because you, were you in the position of the defendant, might have acted differently with respect to Martha Mogull, does not mean that you must find in favor of the plaintiff. It is not your job to substitute your judgment for that of CB [defendant], rather if you are to find for the plaintiff you must determine that the reasons CB has given for its actions are not the true reasons but that they are only offered so as to cover up or justify defendant's discrimination.

[Anti-discrimination laws] do not, however, alter the traditional managerial prerogative to hire and fire employees.

---

determined that because the jury never reached the claim of retaliatory discharge, it had to be presumed not to have considered that part of the instructions. *Mogull, supra,* 319 *N.J.Super.* at 68, 724 *A.2d* 863. We find little merit in that contention. The jury did not have the instructions written out in this case; they heard them, once, and attempted to apply them. Given our law that the charge is to be read as a whole, we conclude that the retaliation instruction, with its beneficial effect of defining more clearly the burden of production, was part of the jury's consideration.

We find no error in the charge. The Appellate Division failed to consider the charge as a whole, but instead criticized small parts of the charge. It is difficult to find that a charge that follows the Model Charge so closely constitutes plain error. Although the charge could have been more artfully drafted, it conveyed the clear message that Mogull bore the burden of proof.

### B.

#### *The Interrogatories*

Defendant objects to jury interrogatories 2(c) and 3(c).
Interrogatory 2 states:

2. Do you find by a preponderance of the credible evidence:

2.(a) That plaintiff was denied benefits relating to the All-state transaction and/or by the resolution of the CBS dispute and/or the resolution of the Edwards & Kel[c]ey dispute?

yes X̲ no

If "no," proceed to # 3.

If "yes," place a checkmark in the appropriate space or spaces in # 2(b).

| | |
|---|---|
| 2.(b) The Allstate transaction | ( X ) |
| The CBS dispute | ( X ) |
| The Edwards & Kel[c]ey dispute | ( X ) |

Proceed to # 2(c).

2.(c) Do you find that defendant C.B. has articulated or advanced one or more legitimate, non-discriminatory reasons for its decision(s) relating to the event(s) checked off in # 2(b) above?

yes no X̲

If "yes," proceed to # 2(d).

If " no," proceed to # 2(e).

2.(d) Do you find by a preponderance of the evidence that plaintiff, Martha Mogull, has proved by a preponderance of the evidence that defendant's legitimate, non-discriminatory reasons were a pretext or "cover-up" for sex discrimination relating to the event(s) checked off in # 2(b) above?

f "no," proceed to # 3.

If "yes," proceed to # 2(e).

2.(e) What amount of money would fairly and reasonably compensate the plaintiff for damages proximately caused by denial of benefits relating to the event(s) checked off in # 2(b) above which may include emotional distress?

$ __500,000__

Interrogatory 3(c) is identical to 2(c), referring to defendant's alleged retaliatory discharge of defendant.

This Court considered the application of the *Fischer* standard that a charge, to be reversible error, must inadequately state the law and tend to confuse or mislead the jury, see *supra* at 463–64, 744 *A*.2d at 1194–95, to interrogatories in *Sons of Thunder, Inc. v. Borden, Inc.*, 148 *N.J.* 396, 690 *A*.2d 575 (1997), and found that interrogatories, like any other instructions to a jury, were "not grounds for a reversal unless they were misleading, confusing or ambiguous." *Id.* at 418, 690 *A*.2d 575. The interrogatories that CB urges as error here were presented to both parties' counsel the day before they were given to the jury. The court went over the interrogatories word by word in a charge conference that appears from the record to have lasted an entire afternoon. Both parties objected to other material in the interrogatories, but, despite having had the interrogatories for their consideration overnight, CB's lawyers never objected to them until the post-trial motions for new trial and judgment notwithstanding the verdict.

Accordingly, we may only reverse the verdict if the trial court's actions in phrasing the interrogatories the way it did constituted plain error. *R.* 1:7–2. Thus, we must determine whether the interrogatories were so misleading, confusing, or ambiguous that they produced an unjust result.

 In asking the jury whether CB had "articulated or advanced one or more legitimate, non-discriminatory reasons for its decision(s)" after the standard "[d]o you find by a preponderance of the credible evidence," the court led the jury to consider CB's submissions under the standard of preponderance of the evidence. Because a LAD defendant, like a Title VII defendant, does not have to prove stage two of the *McDonnell Douglas* test by a preponderance of error, the special interrogatories were erroneous. Mogull admitted as much in her brief to the Appellate Division.

In *McDonnell Douglas,* the Supreme Court described the burden the employer faces after the plaintiff has established a *prima facie* case as that of "articulat[ing] some legitimate, nondiscriminatory reason" for the employment action. 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 678. Further cases have amplified the Supreme Court's holding. In *Furnco Constr. Corp. v. Waters,* 438 *U.S.* 567, 578, 98 *S.Ct.* 2943, 2950, 57 *L.Ed.*2d 957, 968 (1978), the Court held that "[t]o dispel the adverse inference from a prima facie showing under McDonnell Douglas, the employer *need only* 'articulate some legitimate, nondiscriminatory reason.'" (emphasis added).

Three years later, in *Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L.Ed.*2d 207 (1981), the Supreme Court stated that the defendant met its burden if its "evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216. According to the Court, the deciding factor in the analysis of the defendant's proffered reasons was whether they were "*legally* sufficient to justify a judgment for the defendant." *Id.* at 255, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216 (emphasis added).

The Supreme Court clarified this position in *Saint Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 113 *S.Ct.* 2742, 125 *L.Ed.*2d 407 (1993), saying that the defendant must set forth "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 507, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416. The *Hicks* Court held that defendants met their burden "[b]y producing evidence (whether ultimately persuasive or not) of non-discriminatory reasons." *Id.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417. The resulting burden has been described as so light as to be "little more than a mechanical formality; a defendant, unless silent, will almost always prevail." *Developments in the Law—Employment Discrimination: Shifting Burdens of Proof in Employment Discrimination Litigation,* 109 Harv. L.Rev. 1579, 1590 (1996). The court thus erred in requiring CB to prove, instead of produce, its reasons.

For CB to prevail on appeal, however, it must demonstrate that the error was plain error that produced an unjust result. The unjust result alleged by CB to have occurred was the jury's verdict in favor of Mogull. We must consider what would have happened had the jury properly found that CB had met its burden of production. The jury, then in stage three of the *McDonnell Douglas* procedure, would have been free to consider the credibility of CB's evidence in determining whether its asserted reasons were pretextual excuses for intentional discrimination. For the result to be unjust, then, we must find that in the third stage, the jury would have found that Mogull failed to prove her case by a preponderance of the credible evidence. This record does not compel such a finding.

We agree with CB's contention, quoting *Hicks,* that "[i]n the nature of things, the determination that a defendant has met its burden of production . . . can involve no credibility assessment," 509 *U.S.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417, and therefore in most circumstances, a finding that a defendant had failed to meet its burden of production would not equate to a

plaintiff's proving that the defendant had discriminated. In this case, however, the interrogatories invited the jury to consider credibility and, therefore, pretext, at the second stage.

This was a long trial. It lasted from September 30 to November 20, 1996. The jury heard twenty-eight days of argument and testimony. In response to the questions on the jury verdict sheet concerning whether defendant articulated non-discriminatory reasons for its decisions, the jury answered no. In accordance with the verdict sheet instructions, the jurors omitted to answer the question whether plaintiff sustained the burden of proving that defendant's reasons were a "cover-up" for gender discrimination, and proceeded instead to determine the amount of damages that would fairly compensate plaintiff. We are persuaded that the jury's recorded determinations on the verdict sheet, including the ultimate award of damages, necessary reflected the jury's conclusion not only that defendant's proffered reasons were pretextual, but also that plaintiff sustained her burden of proving intentional discrimination based on her gender.

We note that the trial court repeatedly instructed the jury that in order to return a verdict in plaintiff's favor the plaintiff must prove "by a preponderance of the credible evidence that the stated reason or reasons was not the true reason but is only a pretext or excuse for discriminating against the plaintiff because of her gender." Instructions communicating that burden of proof permeated the trial court's charge to the jury. In our view, the jury clearly understood that plaintiff could not prevail in this litigation unless she proved intentional discrimination because of gender, notwithstanding defendant's asserted reasons for its action. In that context, the jury's responses on the verdict sheet—specifically, its responses to questions 2(c) and 2(e), and to questions 3(c) and 3(e)—fairly reflect its conclusion, consistent with the court's instructions, that plaintiff sustained her burden of proving intentional discrimination based on her gender.

In *Sons of Thunder, supra,* the Court determined that a correct jury charge can cure an ambiguity in a jury interrogatory. 148

*N.J.* at 415–20, 690 *A.*2d 575. The interrogatory there asked whether defendant "breached its obligation of good faith and fair dealing . . . in terminating the Contract." *Id.* at 412, 690 *A.*2d 575. In view of the pre-charge conference and the instructions to the jury, the Court was satisfied that the jury understood that this question referred to a breach of the "covenant of good faith and fair dealing in performing the contract." *Id.* at 420, 690 *A.*2d 575. Similarly here, the correct and thorough charge prevented any misunderstanding regarding plaintiff's burden to prove intentional discrimination.

The trial court had repeatedly (more than twenty times) instructed the jury that the burden of proof lay with Mogull. That insistence in the court's instructions cured whatever defect the interrogatories may have introduced. Moreover, the jury's decision and the verdict in favor of plaintiff were supported by the evidence and did not constitute a miscarriage of justice. Defendant's motion for a new trial was thus properly denied.

## V.

The difficulty faced by the trial court in this case is common in employment discrimination actions. The prima facie case and the shifting burdens confuse lawyers and judges, much less juries, who do not have the benefit of extensive study of the law on the subject. Many courts and commentators have observed that the first two stages of the action essentially serve a gatekeeping function, framing for the jury the ultimate issue of discrimination *vel non.*

> At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine. None does if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a prima facie case, and (2) the defendant has failed to meet its burden of production—i.e., has failed to introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. . . . If the defendant has failed to sustain its burden but reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact does remain, which the trier of fact will be called upon to answer.

[*Hicks, supra*, 509 *U.S.* at 509–10, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417–18]

There is continuing confusion over whether a plaintiff who has established a *prima facie* case wins if the defendant's articulated reasons are insufficient as a matter of law. Moreover, many discrimination claims are disposed of on summary judgment. *See Developments in the Law—Employment Discrimination, supra,* 109 Harv. L.Rev. 1579 (resolving that first two phases of *McDonnell Douglas/Goodman* case are akin to summary judgment at trial). Because the first two stages of a *McDonnell Douglas* test seem to require findings of law, and since *McDonnell Douglas* itself arose in the context of a summary judgment, the Appellate Division has stated that many courts that "have considered the issue have determined that, in an employment discrimination case, it is either unnecessary or incorrect to charge the jury on the elements and burden-shifting." *Baker v. National State Bank,* 312 *N.J.Super.* 268, 711 *A.*2d 917 (App.Div.1998) (citing cases), *aff'd on other grounds,* 161 *N.J.* 220, 736 *A.*2d 462 (1999).

The Eighth Circuit has said "*McDonnell Douglas* was not a jury case and its ritual is not well suited as a detailed instruction to the jury." *Grebin v. Sioux Falls Indep. Sch. Dist. No. 49–5,* 779 *F.*2d 18 (8th Cir.1985) (denying claim that instruction should have incorporated three-part analysis), *abrogation on other grounds recognized, Foster v. University of Arkansas,* 938 *F.*2d 111 (8th Cir.1991).

The First Circuit, in *Loeb v. Textron, Inc.,* 600 *F.*2d 1003 (1st Cir.1979), went further. In discussing the then-open question whether *McDonnell Douglas* was appropriate to jury cases at all, the court said "McDonnell Douglas was not written as a prospective jury charge; to read its technical aspects to a jury ... will add little to the juror's understanding of the case." *Id.* at 1017. The First Circuit also anticipated the situation presently facing the Court: "In the unlikely event that there is a dispute over whether the employer has met his burden of production, it will be for the judge to decide whether defendant has stated a legitimate reason with such specificity as to require plaintiff to prove it to be

a pretext." *Id.* n. 16. The Seventh Circuit has even gone so far as to say that the "burden-shifting model applies to pretrial proceedings, not to the jury's evaluation of evidence at trial." *Gehring v. Case Corp.,* 43 *F.*3d 340, 343 (7 th Cir.1994) (Easterbrook, J.). Given the confusion that often results when the first and second stages of the McDonnell Douglas test goes to the jury, we recommend that the court should decide both those issues.

## VI.

In *Cavuoti v. New Jersey Transit Corp.,* 161 *N.J.* 107, 735 *A.*2d 548 (1999) and *Baker v. National State Bank,* 161 *N.J.* 220, 736 *A.*2d 462 (1999), we recently reviewed the relevant principles courts should follow in reviewing awards of punitive damages. Those cases were decided after the trial and Appellate Division opinion in this case. In *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993), we "established two distinct conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under the [the New Jersey Law Against Discrimination]." *Rendine v. Pantzer,* 141 *N.J.* 292, 313, 661 *A.*2d 1202 (1995). Those two requirements are (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.'" *Id.* at 314, 661 *A.*2d 1202.

In *Baker, supra,* 161 *N.J.* at 229, 736 *A.*2d 462 we further found that

[i]n addition, there are substantive constitutional limits on the amount of punitive damages that a jury may award. Prior to the 1990s, the United States Supreme Court had not ruled on the limits on the award of punitive damages in civil cases. The Supreme Court has since held that states are bound by the Due Process Clause of the Fourteenth Amendment to adopt procedures to ensure that punitive damages awards are made through a fair process that includes judicial review of awards.

In *BMW of North America, Inc. v. Gore,* 517 *U.S.* 559, 116 *S.Ct.* 1589, 134 *L.Ed.*2d 809 (1996), (*on remand,* 701 *So.*2d 507 (Ala.) (per curiam), *reh'g denied* (1997)), the Supreme Court, for the first time, employed substantive due process principles to invalidate a

state court award of punitive damages. Although the Court did not establish a clear-cut rule, the majority concluded that courts must consider three factors when examining the size of a punitive damages award:

the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

[*Id.* at 575, 116 *S.Ct.* at 1598–99, 134 *L.Ed.*2d at 826].

Therefore, we said in *Baker* that

[i]n future LAD cases, courts reviewing punitive damages awards should apply both the requirements of the PDA (with the exception of the statutory cap) and the substantive standards of *BMW v. Gore* in order to ensure that any award of punitive damages bears "some reasonable relation" to the injury inflicted.

[*Baker, supra,* 161 *N.J.* at 231, 736 *A.*2d 462].

In this case the jury awarded substantial punitive damages to Mogull. Without objection, the trial court submitted the case to the jury without a specific instruction that jurors were required to find that upper management had actually participated in, or been willfully indifferent to, the wrongful conduct. Such a charge is particularly important when the wrongful conduct, as here, was committed allegedly by many different employees, with varying titles in CB, a large commercial real estate corporation, where there are brokers, agents, and many supervisory personnel. *See Re/Max of New Jersey v. Wausau Ins. Co., etc.,* 316 *N.J.Super.* 514, 720 *A.*2d 658 (1998) (discussing whether licensed real estate salespersons should be considered employees or independent contractors for purposes of computing workers' compensation insurance premiums).

Because the Appellate Division found that the entire case had to be retried, it did not decide defendant's punitive damage claim, but specifically observed "that on retrial, we assume the punitive damage jury charge will reflect our decision in *Maiorino v. Schering–Plough Corp.*", 319 *N.J.Super.* at 57, 724 *A.*2d 863. In that case punitive damages could not be assessed against the employer because the jury had not been given an upper manage-

ment charge. *Maiorino v. Schering–Plough Corp.*, 302 *N.J.Super.* 323, 355, 695 *A.*2d 353 (App.Div.), *certif. denied*, 152 *N.J.* 189, 704 *A.*2d 19 (1957).

Because the trial court did not give the upper management charge, that issue arises as plain error under *Rule* 2:10–2. Therefore, the Appellate Division on remand will have to determine whether the omission of the *Lehmann* upper-management charge was clearly capable of producing an unjust result. The Appellate Division also will have to determine whether the substantive standards of *BMW v. Gore* were fully and completely addressed by the trial court.

## VII.

### *Dismissal of Individual Defendants*

In her cross-appeal, Mogull asserts that the trial court should not have dismissed the discrimination claims against the remaining individual defendants. At the close of all the evidence, defendants moved to dismiss the discrimination claims against the remaining individual defendants, arguing that there was no evidence of discrimination by them. The court granted the motion (except as to Appel) because the individuals were acting within the scope of their employment; they were not seeking personal gain; and punitive damages could be assessed against the company without the individuals. The Appellate Division found Mogull's arguments to be without merit and to require no further opinion. *Mogull, supra*, 319 *N.J.Super.* at 57, 724 *A.*2d 863.

Defendant properly asserts that Mogull never identified the purported bases for her LAD claims against the individual defendants. Her complaint lumped all of the individual defendants together with CB. And although she now argues "supervisor" or "aider and abettor" liability, those theories—and the supporting references to *N.J.S.A.* 10:5–12(a) and (e)—were not advanced until the cross-appeal. Moreover, when the trial court dismissed the claims against the individual defendants, plaintiff's counsel stated

no objection. On the record before the trial court, we find that the trial court's dismissal of the motion was not an abuse of discretion.

## VIII.

The judgment of the Appellate Division reversing plaintiff's award of compensatory damages is reversed, and the trial court's verdict of compensatory damages is reinstated. The case is remanded to the Appellate Division for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.